2009 UT App 198

**In the matter of the ADOPTION OF A.F.K., a minor child.**

**M.F.K. and C.K., Appellants,**

v.

**S.B. and K.B., Appellees.**

**No. 20080581–CA.**

Court of Appeals of Utah.

July 30, 2009.

Steven Kuhnhausen, Salt Lake City, for Appellants.

Marlin J. Grant, Logan, for Appellees.

Martha Pierce, Salt Lake City, Guardian Ad Litem.

Before Judges GREENWOOD, BENCH, and ORME.

## OPINION

ORME, Judge:

¶ 1 Appellants M.F.K. (First Mother) and C.K. (First Father) (collectively, First Parents) [1] primarily focus on the narrow issue of whether the time period to establish prima facie abandonment under Utah Code section 78A–6–508(1)(a) begins to run at the time physical custody of a child is relinquished pursuant to a temporary guardianship arrangement or at the expiration of such an arrangement—removing from the abandon-

---

1. We use the terms father, mother, and parents for ease of usage only, and these identifying terms do not carry any legal significance for purposes of this opinion.

ment analysis consideration of the time during which the temporary guardianship is in place. In light of our determination that Appellees K.B. (Second Mother) and S.B. (Second Father) (collectively, Second Parents) made a prima facie showing of abandonment under subsections (1)(b) and (1)(c) of section 78A–6–508, we do not definitively interpret the language of subsection (1)(a). We conclude, however, that a court may consider the actions or inactions of a parent while a child is in the care of another when making its determination whether abandonment occurred. Because First Parents did not take any action showing a continuing concern for A.F.K., or desire to be A.F.K.'s parents, during the six-month temporary guardianship and the five months thereafter, we affirm both the trial court's conclusion that First Parents abandoned A.F.K. and its various related rulings.

## BACKGROUND

¶ 2 First Parents decided to adopt a foreign child and contacted Focus on Children (the Adoption Agency), which was run by Second Parents. Sometime thereafter, First Mother became pregnant with twins and gave birth in September 2005. Around the time the twins were born, First Parents received a referral for A.F.K., a child born in China in October 2004 and abandoned under a bridge. Because First Mother was caring for the newborn twins, First Father went to China alone in December 2005 to bring A.F.K. to her new home in Kansas. At the time A.F.K. arrived in First Parents' home, she was fourteen months old and had spent her entire life in an orphanage with multiple care-givers. In addition to A.F.K. and the two-month-old twins, First Parents had two other biological children, ages three and five when A.F.K. arrived.

¶ 3 A.F.K. did not transition well into First Parents' home. She showed jealous behavior and aggressive tendencies towards the twins—e.g., "biting, hitting, turning the twins over in their carriers and otherwise aggressively attacking the twins"—and seemed to need more one-on-one attention than First Parents could provide. First Mother also began suffering from postpartum depression. After about six months, First Parents determined it was best for A.F.K., as well as the remainder of their family, if A.F.K. went to live with another family.[2]

¶ 4 First Parents then contacted the Adoption Agency, and Second Parents agreed to personally care for A.F.K. temporarily. First Parents and Second Parents accordingly entered into a written temporary guardianship agreement in June 2006, whereby Second Parents agreed to act as A.F.K.'s temporary guardians for a little over six months. Under the terms of the agreement, Second Parents were to provide for all of A.F.K.'s needs during the six months, except First Parents continued to "be responsible for payment of medical insurance premiums associated with her current insurance coverage." The trial court found that the evidence, namely telephone calls and email between the two families, indicated that First Parents did not intend that this temporary placement be just for respite care but rather that they contemplated A.F.K. would be adopted by another family and that the temporary arrangement would facilitate that adoption.

¶ 5 At some point after Second Father flew to Kansas City, where First Father relinquished physical custody of A.F.K., First Parents expressed regret about their decision and Second Parents indicated a desire to adopt A.F.K. themselves. First Father responded to Second Parents' expressed desire, stating that it was originally First Parents' intention that Second Parents would help First Parents find another family to adopt A.F.K. Nonetheless, First Parents explained via email that they regretted relinquishing physical custody of A.F.K. because they had a particular type of adoptive family in mind for A.F.K. and wanted to actively participate in choosing her adoptive family. The type of couple they envisioned was one who had been unable to have kids of their own, who "desperately wanted" a child, and who would

---

**2.** The trial court found that this decision was in the best interests of A.F.K. and the family at the time, because A.F.K.'s placement with First Parents was "a bad fit" for First Parents and "chaotic" for A.F.K.

lavish love and attention on A.F.K., "mak[ing] her the central focus of the[ir] lives."[3] First Father further requested that Second Parents return the original adoption papers so First Parents could proceed with their original plan for A.F.K.'s readoption, as a few adoptive couples matching their hoped-for description were available in Kansas.

¶ 6 The trial court, however, found that First Parents apparently changed their mind about whether Second Parents could adopt A.F.K. Indeed, an email dated August 4, 2006, from First Father to Second Father stated, "it's time to move forward with your formal adoption of [A.F.K.]." In response, Second Parents requested that First Parents "sign the necessary relinquishment and consent forms as soon as possible." First Parents never signed the requested forms.

¶ 7 The temporary guardianship agreement expired on December 31, 2006, and First Parents did not travel to Utah to retrieve A.F.K. or express a desire that A.F.K. be returned to them. On the contrary, "[First Father] sent an[other] email on January 23, 2007, copied to [First Mother], reconfirming their intent that [Second Parents] could adopt [A.F.K.]." First Parents did not notify Second Parents that they planned to take A.F.K. back to their home until they expressed that intent during a telephone call on May 20, 2007, about five months after the temporary guardianship expired. Second Parents, however, had already filed a petition for adoption in Utah's First District Court on November 29, 2006.[4]

¶ 8 After learning that First Parents wanted to regain custody of A.F.K., Second Parents sought an order of temporary custody in the First District Court. Second Parents also filed a petition for custody and termination of parental rights in juvenile court. The juvenile court ordered that the proceedings in both courts be consolidated in the First District Court, before Judge Low.[5] After a hearing on July 16, 2007, Judge Low granted Second Parents temporary custody of A.F.K. First Parents were permitted visitation with A.F.K. and took full advantage of the opportunity, with First Mother visiting A.F.K. over thirty times while the matter was pending and First Father visiting five or six times.

¶ 9 During the course of the proceedings, an adoptive home study was performed to evaluate Second Parents' home as a suitable placement for A.F.K. The home study showed that A.F.K. had integrated well into Second Parents' home. She was not only attached to Second Parents but also to their other children who still lived in their home.[6] The trial

3. Second Parents did not match this description because they already had eight children, six of whom were adopted. As discussed further in footnote 6, four of those eight children were living with Second Parents at the time they sought to adopt A.F.K.

4. The adoption petition was not served on First Parents, and, on this basis, they claim the adoption petition and the petition seeking to terminate their parental rights should have been dismissed. However, because First Parents voluntarily entered the proceedings to contest the adoption and request that the court restore custody to them, they voluntarily submitted to the court's jurisdiction, sought affirmative relief, and clearly waived their right to challenge the lack of service. See J.B. Colt Co. v. District Court of Fifth Judicial Dist., 72 Utah 281, 269 P. 1017, 1019 (1928) ("It is an elementary rule of law that a party to a judicial proceeding cannot invoke the jurisdiction of a court affecting the merits of a controversy, and thereafter be heard to say that he is not in court."); Nunley v. Nunley, 757 P.2d 473, 475 (Utah Ct.App.1988) ("[A] party may challenge the court's jurisdiction without submitting himself to it, but if a party asks the court for affirmative relief, that party is subject to the court's jurisdiction.") (citations omitted).

5. We note that some confusion arose regarding whether the juvenile court had to terminate First Parents' parental rights in order for the First District Court to obtain jurisdiction. Judge Low thought so, and accordingly returned the case to the juvenile court to terminate First Parents' rights. The juvenile court then transferred the case back to the First District Court on the authority of In re adoption of B.B.G., 2007 UT App 149, 160 P.3d 9, i.e., that because an adoption petition was pending in the First District Court, the First District Court had jurisdiction to terminate the parental rights. See id. ¶¶ 10–11. At that time, Judge Low had retired and the case was assigned to Judge Judkins. Subsequently, the case was assigned to Judge Taylor, a senior district court judge.

6. Only four children were living with Second Parents at the time of the home study. Second Parents' eight children, six of whom were

[c]ourt f[ound] that [A.F.K.] flourished in the home of [Second Parents]. When she first arrived ..., she was underweight, appeared with leathery skin and dull/brittle hair and was in need of one-on-one attention. She developed her language skills and cognitive processes during this time (i.e.[, from] age 6 months to 3 years). [A.F.K.] was well-received and loved by everyone in [Second Parents'] home and they lavished their love and affections on her without regard from the first moment [Second Parents] received her and particularly after [First Father] gave the OK for [them] to go ahead and adopt her.

The court further found that A.F.K. had not developed the expected attachment or reattachment disorders after having been abandoned at birth, living in an orphanage for fourteen months, being in First Parents' care for six months, and living with Second Parents thereafter. The court found that "due to [Second Parents'] loving care and nurturing, [A.F.K.] was able to relate well in social settings, become comfortable around other adults, and was able to reach out and love others, even in nursery."

¶ 10 A bonding study was also performed to evaluate the relationship between A.F.K. and First Parents, and it revealed that a "positive attachment" between First Parents and A.F.K. existed. The study showed that she referred to First Father as "Hat Daddy" and to First Mother as "the Lady Mommy." She was comfortable with both parents, sought them out in uncomfortable situations, and was able to differentiate between First Mother's and First Father's personalities—for example, she knew what to expect from each parent during play time. She was also comfortable with their physical affection. The evaluator concluded that "[A.F.K.'s] behavior with [First Parents] was different [than] that of children who are observed with stepparents, siblings or extended relatives, and was consistent with children who are attached to their parents." [7]

¶ 11 The parties stipulated that the Chinese adoption would be considered valid for purposes of the proceedings, and Judge Low gave the stipulation its intended effect. After Judge Low retired and Judge Taylor took over the case, Judge Taylor expressed concern about the parties' stipulation that the Chinese adoption was valid because he did not think the adoption was ever finalized in the United States in accordance with federal or Kansas law. The court, however, engaged in the analysis necessary to determine whether "[First Parents'] parental rights, or whatever rights they may have had," should be terminated on the basis of abandoning A.F.K.

¶ 12 As more fully discussed later in this opinion, the trial court determined that clear and convincing evidence established three separate legal grounds for prima facie abandonment under Utah Code section 78A–6–508(1)(a)–(c). See Utah Code Ann. § 78A–6–508(1)(a)–(c) (2008).[8] It found that the fol-

adopted, were ages ten to twenty-years-old. Three of the adopted children were not living in Second Parents' home, having gone to live in other homes or facilities due to behavioral issues or special needs arising from various medical conditions and disorders. Second Parents' oldest biological son was serving a religious mission at the time.

7. We note that some of the evidence presented to the trial court, although not specifically mentioned in the factual findings, indicates that A.F.K. experienced anxiety when the court-ordered visitations with First Parents began, following their eleven-month absence from A.F.K. The guardian ad litem then serving A.F.K., who was "ordered ... to help [A.F.K.] build a relationship with [First Parents] just in case the child ended up being placed with them for adoption," helped conduct the supervised visits between A.F.K. and First Parents. He noted allegations by Second Parents that A.F.K. was always "upset before and after the visit" with First Mother or First Parents, and he acknowledged that he had personally observed A.F.K.'s distress "before the visits, but she has always calmed down just fine when with [First Mother]." He also indicated that on one particular day when A.F.K. was more distressed than usual and cried upon seeing First Mother, he thought "[A.F.K.] was either in a really strange mood that day, or [Second Parents] had told her something about the visit or about [First Mother] that was really upsetting to her." He otherwise noted that "[A.F.K.] had progressed from not really knowing [First Mother] to running to her at the beginning of a visit and being comfortable around her."

8. As a convenience to the reader, we cite to the current version of the Utah Code throughout this opinion. Although the case was decided prior to the recent recodification of Title 78, the applica-

lowing specific facts established prima facie abandonment: (1) First Parents relinquished custody for over six months "without indicating a firm intention to resume custody within that six month period"; (2) "the surrender of custody was for purposes of adoption and ... more than 11 months passed before [First Parents] sought [A.F.K.]'s return"; (3) "[First Parents] maintained no communication by any source ... with [A.F.K.] for more than thirteen (13) months"; and (4) "[First Parents] failed to show the normal interest of a natural parent with [A.F.K.], sent no financial support, or even inquiries regarding her welfare without just cause for eleven (11) months." The trial court also concluded that First Parents had not "rebut[ted] th[e] clear and convincing evidence" supporting these determinations; rather, they had "stipulated to the same." [9]

¶ 13 The court further determined that "[d]uring th[e] twenty (20) month period [with Second Parents], [A.F.K.] ... formed a primary secure attachment and identity with [Second Parents] as her parents" and "this bond [wa]s significant and secure and beneficial to the minor child." While acknowledging that "[A.F.K.] may have had a memory of [First Parents] and ... was able to have a warm and loving relationship with [them] after they resumed visitation," the court concluded that said "relationship is only a secondary attachment and will never replace the primary attachment that is secured to [Second Parents]."

¶ 14 In accordance with that determination, the court concluded that placing A.F.K. in Second Parents' custody was in A.F.K.'s best interest, despite pending federal criminal charges against them,[10] because she "developed her primary secure attachment and developed her identity" while in their care, "particularly during her language development and cognitive development period." The court "awarded legal custody and guardianship of [A.F.K.]" to Second Parents and noted that the adoption determination would be stayed pending resolution of the criminal charges. The court outlined how the adoption inquiry would proceed based on several prospective circumstances and indicated that First Parents might be allowed to adopt A.F.K. in the event adoption by Second Parents proved not to be in A.F.K.'s best interest. Specifically, the court outlined the manner in which it would proceed with regard to the adoption, as follows: (1) if the federal charges were dismissed or Second Parents were both found not guilty, Second Parents could adopt A.F.K. "upon the mere filing of an Affidavit ... showing that the federal case is no longer a concern"; (2) "[i]f the federal case results in misdemeanor type convictions or sentences, the Court may schedule a hearing to consider [A.F.K.]'s best interest at that time, considering the circumstances of [Second Parents] together with the duration of the sentences"; (3) if felony convictions resulted, "then the Court w[ould] order a hearing to determine what is in [A.F.K.]'s best interest" and First Parents

---

ble provisions, while renumbered, have not been substantively changed.

9. This characterization is not challenged by First Parents on appeal, although it appears that First Parents acceded to the basic facts underlying the trial court's abandonment analysis rather than that they formally stipulated to facts or evidence.

10. After Second Parents took A.F.K. into their care, Second Parents and the Adoption Agency were charged in a 135–count federal indictment. The charges included conspiracy to commit alien smuggling and visa fraud; conspiracy to commit money laundering; aiding and abetting, as well as encouraging or inducing the bringing of illegal aliens into the United States; aiding and abetting fraud and misuse of visas; and aiding and abetting unlawful activity in monetary property transactions.

First Parents argue that the court erred in failing to draw a negative inference from Second Parents' Father's decision to assert his Fifth Amendment rights to not answer certain questions regarding these charges. It appears likely that the court did draw a negative inference from such testimony as it is clear the court considered the criminal charges in its best interest analysis. Judge Taylor indicated that this was a very difficult case that had kept him up at night because of these charges. Counterbalanced against this concern was the fact that A.F.K. had a primary attachment to Second Parents, although the court noted that either family presented a decent placement option for A.F.K. In any event, while a trial court *may* draw a negative inference from a witness's assertion of the Fifth Amendment in a civil case, *see Chen v. Stewart*, 2005 UT 68, ¶ 31 n. 4, 123 P.3d 416, we do not think it is mandatory that a trial court draw a negative inference from such an assertion.

would "be considered as a potential family" to adopt, although they would not be given "standing to object to [an alternative] placement"; [11] and (4) "[i]f the federal case is not decided and is continuing on pending matters at the time [A.F.K.] turns eight (8) years old, ... then the Court will grant the adoption because it is in the best interest of the child inasmuch as she will have been in [Second Parents'] home and custody for over six and one-half (6 1/2) years."

## ISSUES AND STANDARDS OF REVIEW

¶ 15 The first issue is "[w]hether the [trial] court erred in failing to follow the law of the case as to the validity of [First Parents'] Chinese adoption for all purposes"—based on Judge Low's prior ruling that the parties' stipulation would be given its intended effect—and in "thereby failing to afford [First Parents] the parental presumption." "[T]he application of the law of the case doctrine ... is ordinarily reviewed under an abuse of discretion standard." *In re E.H.*, 2006 UT 36, ¶ 32, 137 P.3d 809. However, "[w]hen a legal question is presented to an appellate court in law-of-the-case packaging," *id.*, the abuse of discretion standard must yield to the correctness standard of review. *See id.* ¶ 33 ("We can identify no reason why an erroneous legal determination should be afforded greater discretion on appeal merely because it wears the garb of law of the case. For purposes of review, then, considerations of law of the case must yield to those of the substance of the underlying ruling when ascertaining the proper standard of review.").[12]

¶ 16 Second, we consider First Parents' principal argument on appeal, namely that a temporary guardianship agreement creates an exception under section 78A–6–508(1)(a) that precludes consideration of the length of a temporary guardianship in the abandonment analysis. We also evaluate whether this court's prior declaration that the statutory definition of prima facie abandonment supplements Utah case law's definition of abandonment, *see In re J.R.T.*, 750 P.2d 1234, 1236 (Utah Ct.App.1988), precluded the trial court from determining that First Parents abandoned A.F.K. when an attachment between First Parents and A.F.K. existed. "[M]atters of statutory construction are questions of law that are reviewed for correctness," *In re adoption of P.N.*, 2006 UT 64, ¶ 12, 148 P.3d 927 (alteration in original) (citation and internal quotation marks omitted), as are issues that require interpretation of prior decisional precedents, *see State v. Leyva*, 951 P.2d 738, 741 (Utah 1997) ("A lower court's interpretation of binding case law presents a question of law which we review for correctness.").

¶ 17 Third, we address whether the trial court erred in denying First Parents' motion for a new trial and motion to amend the judgment, which motions were based on the claimed discovery of new evidence.[13] We review the denial of such motions for an abuse of discretion. *See Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 25, 82 P.3d 1064, *cert. denied*, 541 U.S. 960, 124 S.Ct. 1716, 158 L.Ed.2d 401 (2004). Because a "trial court has broad discretion to grant or deny a motion for a new trial" under rule 59 of the Utah Rules of Civil Procedure, "we will reverse only if there is no reasonable basis for the decision." *Id.* (citation and internal quotation marks omitted). *See* Utah R. Civ. P. 59(a), (e).

**11.** The court further noted that if one of Second Parents received a felony conviction or went to prison, and one did not, a best interest hearing would likewise be conducted.

**12.** While recognizing this feature of "law of the case" jurisprudence, the Utah Supreme Court emphasized that "[b]y stating this rule, [it] d[id] not intend to diminish the importance of the law of the case doctrine, nor d[id it] surrender the authority of appellate courts to enforce the principle by vacating unexplained and unjustified renunciations of prior court orders." *In re E.H.*, 2006 UT 36, ¶ 33, 137 P.3d 809.

**13.** First Parents raise several other issues that do not merit in-depth discussion. We touch upon these additional issues throughout the opinion only insofar as they are critical to our analysis. *See generally State v. Carter*, 776 P.2d 886, 888 (Utah 1989) ("[T]his Court need not analyze and address in writing each and every argument, issue, or claim raised and properly before us on appeal. Rather, it is a maxim of appellate review that the nature and extent of an opinion rendered by an appellate court is largely discretionary with that court.").

## ANALYSIS

### I. Law of the Case Doctrine

¶ 18 First Parents argue that the trial court—specifically Judge Taylor—erred in failing to follow the law of the case when it determined that A.F.K. had not been officially adopted by First Parents.[14] The fact that the trial court entered conclusions of law on this issue, however, is not prejudicial error— if it is error at all—because the trial court proceeded to terminate First Parents' parental rights, "or whatever rights they may have had," as would have been necessary if First Parents had formally adopted A.F.K. in the United States.

¶ 19 When the parties stipulated that the adoption was valid for all purposes in these proceedings, Judge Low was expected to proceed based on the stipulation. *Cf. In re E.H.*, 2006 UT 36, ¶ 22, 137 P.3d 809 ("[S]tipulations may be perceived as paring back the role of the court as fact-finder, but in most cases this result should be welcomed as an exercise entirely consistent with efficient and just judicial administration."). And while Judge Low did question whether A.F.K. was formally adopted, he decided to accept that the adoption occurred based on the parties' stipulation. After the case was assigned to Judge Taylor, it was nonetheless appropriate for the court to express concern about the stipulation because, based on Judge Taylor's review of the law and arguments, he did not think First Parents had ever finalized the adoption in the United States, which seems to be an accurate interpretation of the applicable Kansas statute.[15]

¶ 20 In any event, even though the law of the case doctrine provides that "a decision made on an issue during one stage of a case is binding in successive stages of the same litigation," *IHC Health Servs., Inc. v. D & K Mgmt., Inc.*, 2008 UT 73, ¶ 26, 196 P.3d 588 (citation and internal quotation marks omitted), interlocutory rulings are not set in stone and a trial court may revisit a ruling if it is in error. *See id.* ¶ 27 ("While a case remains pending before the district court prior to any appeal, the parties are

14. First Parents further allege that when the court failed to follow the law of the case, it put both sets of parents on equal footing and engaged in a best interest analysis that otherwise would not have been applicable. We note that the trial court did not engage in any overt best interest analysis until after it had decided that cause had been shown for terminating any parental rights First Parents had. And in any event, a best interest analysis must always precede an ultimate decision to terminate parental rights in contested adoption cases, *see In re adoption of T.H.*, 2007 UT App 341, ¶¶ 11, 15–16, 171 P.3d 480, as will be discussed in further detail later in this opinion. We, accordingly, do not think the analysis on how to rebut the parental presumption discussed in *Hutchison v. Hutchison*, 649 P.2d 38 (Utah 1982), is pertinent because once the court determined there were grounds for terminating First Parents' rights, First Parents were not entitled to a parental presumption. *See id.* at 41 ("The [parental] presumption does not apply to a parent who would be subject to the termination of all parental rights due to unfitness, abandonment, or substantial neglect, since such a parent is *a fortiori* not entitled to custody.").

15. Section 59–2144(a) of the Kansas Statutes provides:

> When a Kansas resident adopts a child in a foreign country in accordance with the laws of the foreign country pertaining to relinquishment, termination of parental rights and consent to the adoption, the decree of adoption or a similar document or documents which evidences finalization of the adoption in the foreign country, and evidence of lawful admission into the United States, *when filed with and entered in the records of the clerk of the district court of any county in this state*, has the same force and effect as if the decree of adoption, or a similar document or documents which evidences finalization of the adoption in the foreign country, was granted in accordance with the provisions of the Kansas adoption and relinquishment act.

Kan. Stat. Ann. § 59–2144(a) (2005) (emphasis added). Because First Parents never filed the adoption papers with a Kansas court, the adoption appears never to have been finalized in the United States. Moreover, there was an issue regarding whether First Father, alone, or both First Father and First Mother, were recognized as adoptive parents in China, and whether A.F.K. had automatically been granted citizenship. *See generally* 8 U.S.C.A. § 1431(a)-(b) (West 2005) (providing that a child will automatically be granted citizenship, even though born outside of the United States, "if the child satisfies the requirements applicable to adopted children under section 1101(b)(1) of this title"); ' *id.* § 1101(b)(1)(F)(i) (defining a child as one "who has been adopted abroad by a United States citizen and spouse jointly ... who personally saw and observed the child prior to or during the adoption proceedings").

bound by the court's prior decision, but the court remains free to reconsider that decision. It may do so sua sponte or at the suggestion of one of the parties. And this discretionary power of reconsideration includes the right ... to decline to reopen a matter it has already decided. As long as the case has not been appealed and remanded, reconsideration of an issue before a final judgment is within the sound discretion of the district court.") (footnotes omitted). Strong policy reasons, including judicial efficiency and possible avoidance of an appeal, empower a trial court to correct its erroneous ruling before final judgment. *See State v. Ruiz*, 2009 UT App 121, ¶ 10, 210 P.3d 955 ("The rationale underlying the [law of the case] doctrine 'is that in the interest of economy of time and efficiency of procedure, it is desirable to avoid the delays and the difficulties involved in repetitious contentions and rulings upon the same proposition in the same case.' Moreover, a judge can change his or her mind any time up until the entry of final judgment, which is true even if the judge has taken over the case from another judge, as 'a trial court is not inexorably bound by its own precedents.' ... '[T]he two judges, while different persons, constitute a single judicial office for law of the case purposes.'") (citations and additional internal quotation marks omitted).

¶ 21 Furthermore, the Utah Supreme Court has indicated that judges need to exercise great care when surrendering their authority in adoption cases. *See In re E.H.*, 2006 UT 36, ¶¶ 21, 26, 137 P.3d 809 (stating that stipulations will not be upheld where they inappropriately intrude on core judicial functions and that adoption cases are cases "where considerations of public policy or fundamental constitutional rights permeate ..., [where] more acute judicial oversight is warranted and often required," and where "court[s] must exercise greater care when delegating judicial functions"). We accordingly are not convinced that the trial court erred in entering its legal conclusions on the issue, but as the court went on to terminate any parental rights First Parents had, employing the very analysis it would have used had it unqualifiedly recognized First Parents' adoption of A.F.K. as valid in every respect,

any such error was not prejudicial. We thus proceed to determine whether the court's abandonment determination, which is the key to its termination decision, is sustainable.

## II. Abandonment of A.F.K.

### A. The Abandonment Statute and Applicable Case Law

¶ 22 By statute, prima facie evidence of abandonment is demonstrated upon a showing of the relinquishment of physical custody of a child followed by a six-month period with no expressed intention "to resume physical custody or to make arrangements for the care of the child." Utah Code Ann. § 78A–6–508(1)(a) (2008). First Parents argue that "making arrangements for the care of [a] child is an exception to the six-month time period" under the statute, *see id.*, and they therefore assert that "during the operation of the temporary guardianship authorization, no evidence of abandonment can be inferred or presumed or found." In accordance with this argument, First Parents reason that once the first six months passed pursuant to the temporary guardianship, it was acceptable for them to wait five months to evidence an intent to take A.F.K. back to their home because they had a full six months following the expiration of the temporary guardianship before abandonment could be presumed under the statute.

¶ 23 In Utah, when "a person whose consent for an adoption is required ... refuse[s] to consent, the court shall determine whether proper grounds exist for the termination of that person's [parental] rights." Utah Code Ann. § 78B–6–133(1) (2008). *See also id.* §§ 78A–6–507 (stating the grounds on which parental rights may be terminated), –508 (establishing what parental actions or inactions constitute prima facie evidence of the grounds for termination of parental rights); *id.* § 78B–6–112 (granting the district court jurisdiction and establishing the circumstances that would allow termination of parental rights related to an adoption case). Such grounds include abandonment. *See id.* § 78A–6–507(1)(a) ("The court may terminate all parental rights with respect to a parent if

the court finds ... that the parent has abandoned the child.").

¶ 24 Our case law has "established a two-pronged test for determining abandonment: first, whether the parent's conduct evidenced a conscious disregard for his or her parental obligations, and second, whether that disregard led to the destruction of the parent-child relationship." *In re J.R.T.*, 750 P.2d 1234, 1236 (Utah Ct.App.1988). Utah Code section 78A–6–508(1) further declares that "[i]n determining whether a parent or parents have abandoned a child" certain circumstances constitute "prima facie evidence of abandonment," which circumstances include when parents,

> (a) although having legal custody of the child, have surrendered physical custody of the child, and for a period of six months following the surrender have not manifested to the child or to the person having the physical custody of the child a firm intention to resume physical custody or to make arrangements for the care of the child; [16]
>
> (b) have failed to communicate with the child by mail, telephone, or otherwise for six months; [or]
>
> (c) [have] failed to have shown the normal interest of a natural parent, without just cause....

Utah Code Ann. § 78A–6–508(1)(a)–(c).[17] The Legislature's definitions of prima facie abandonment supplement our case law's test of abandonment. *See In re J.R.T.*, 750 P.2d at 1236 (making this statement regarding a formerly numbered statute defining prima facie evidence of abandonment).

■■■ ¶ 25 In determining whether abandonment occurred, courts may look to "the parent's objective conduct or the parent's expressed subjective intent." *Id.* The movant must prove abandonment by clear and convincing evidence, and this standard applies to "both [the] evidentiary support for a finding of fact and the level of persuasion on the reasonableness of a conclusion." *In re J.C.O.*, 734 P.2d 458, 461–62 (Utah 1987) (citation and internal quotation marks omitted).

■■■ ¶ 26 The plain language of section 78A–6–508(1)(a) sets forth an exception that prevents a six-month physical absence from a child from constituting prima facie evidence of abandonment when, as in this case, a parent has made arrangements for the child's care. *See* Utah Code Ann. § 78A–6–508(1)(a). But when a parent puts forth evidence that an exception exists under subsection (1)(a), a trial court is not precluded from considering evidence of that parent's actions during the six-month period when those actions indicate that an abandonment has actually occurred. We emphasize that section 78A–6–508(1) defines only "prima facie evidence of abandonment," which an opposing party is of course free to rebut or otherwise challenge. *See Handy v. U.S. Bank*, 2008 UT App 9, ¶ 25, 177 P.3d 80. Furthermore, if the facts provide clear and convincing proof that abandonment occurred under our case law's test or under the other subsections of section 78A–6–508(1), a conclusion of abandonment should result, notwithstanding the interplay of subsection (1)(a)'s prescriptive period and its exception covering temporary placements. *See* Utah Code Ann. § 78A–6–508(1). To preclude consideration of a parent's actions and expressed intent during any supposedly temporary period of time could prevent a court from considering evidence directly bearing on a child's best interest. *See generally In re J.R.T.*, 750 P.2d at 1238 ("The best interest of the child has always been a paramount or 'polar star' principle in cases involving termination of

---

16. To be clear, the exception argued by First Parents is based on this language of subsection (1)(a). We agree the subsection sets forth an exception to abandonment, otherwise established by a six-month physical absence, if a parent "manifest[s] ... a firm intention to resume physical custody or to make arrangements for the care of the child." Utah Code Ann. § 78A–6–508(1)(a) (2008). First Parents insist such an intention was clear from the very terms of their *temporary* guardianship arrangement with Second Parents. Whether such an exception precludes all consideration of the actions of a parent during that temporary period of time, however, is another matter.

17. Subsection (1)(d) is not relevant to this appeal because it deals with abandonment of infants who are twelve months old or younger. *See* Utah Code Ann. §§ 78A–6–508(1)(d), –316(1) (2008).

parental rights, but it has not been the sole criterion.") (citation and additional internal quotation marks omitted). We thus conclude that the arrangements, the actions, and the intent of the parents are all factors to consider under the necessary, comprehensive abandonment analysis.

¶ 27 Accordingly, and in light of our determination, discussed later in this opinion, that the trial court properly found clear and convincing evidence establishing abandonment under subsections (1)(b) and (1)(c) of section 78A–6–508—which evidence First Parents failed to rebut—it is not necessary for us to definitively decide the narrow question presented by First Parents, i.e., whether a temporary arrangement invariably tolls the statutory abandonment period under subsection (1)(a).[18] While we decline to interpret the specific language of subsection (1)(a), we have no hesitancy in determining that the exception in subsection (1)(a) does not apply to subsections (1)(b) or (1)(c) because the subsections are set apart by the conjunction "or," and the exception appears only in subsection (1)(a), not in the other subsections or the introductory language of section (1). *Cf. State v. Jacobs*, 2006 UT App 356, ¶ 7, 144 P.3d 226 ("[B]ecause statutory construction presumes that the expression of one should be interpreted as the exclusion of another[,] ... we should give effect to any omission in the [statute's] language by presuming that the omission is purposeful.") (omission and second and third alterations in original) (citation and internal quotation marks omitted).

## B.   Abandonment of A.F.K.

### 1.   Statutory Prima Facie Evidence of Abandonment

¶ 28 The trial court concluded that clear and convincing evidence established a prima facie case of abandonment under subsections (1)(a), (1)(b), and (1)(c) of section 78A–6–508. The court concluded that prima facie evidence existed under subsection (1)(a) because First Parents "surrender[ed] ... custody of [A.F.K.] for more than six (6) months without indicating a firm intention to resume custody within that six month period." *See* Utah Code Ann. § 78A–6–508(1)(a) (2008). The court further reasoned that "the surrender of custody was for purposes of adoption and not for respite care, and that more than 11 months passed before [First Parents] sought [A.F.K.]'s return." The court determined that prima facie evidence existed under subsection (1)(b) "because [First Parents] maintained no communication by any source (cards, gifts, physical visits, mail, telephone or otherwise) with the minor child for more than thirteen (13) months."[19]

---

18. We note, however, that considerable opportunity for mischief would result if we were to interpret subsection (1)(a) as allowing a parent to have another six months of leeway, on top of a six-month temporary custody period, before a prima facie showing of abandonment could be made under subsection (1)(a). And we think it is doubtful the Legislature contemplated that a temporary arrangement under the circumstances of this case—where the original purpose of the arrangement was to facilitate an adoption and where the parents had no contact and evidenced no intent to resume the care of A.F.K. for eleven months—would qualify as an exception to the otherwise prima facie evidence of abandonment. If we accepted First Parents' interpretation, a parent could, in essence, continue to "temporarily" relinquish custody in six-month intervals, based on a series of agreements, without ever having contact with the child. Then, after many years, the parent could swoop back into the child's life and seek to remove the child from his or her then-established family—which in most cases would be contrary to the child's best interest—on the theory there was no abandonment as a matter of law. In the same regard, contrary to

First Parents' argument, we do not think that our holding is at odds with the public policy promoting temporary guardianship arrangements during times when parents need short-term assistance, because a truly temporary arrangement made by concerned and caring parents would not constitute abandonment under this decision.

19. First Parents allege that they did send one teddy bear to A.F.K. A single gift or attempt during an eleven or thirteen month period, however, does not change our analysis. First Parents' counsel at oral argument further pointed to A.F.K.'s age and limited command of English in an attempt to explain First Parents' lack of effort with regard to communication. While on a practical level this point has some merit, we think the trial court aptly addressed the issue: "It is the responsibility of the adult to maintain a relationship with the child, whether the child can communicate or not." We agree and note that even if a telephone call with the child is impossible, other options exist these days, such as mailing recorded video greetings or transmitting such greetings via the internet. In any event, telephone calls or emails to the guardian expressing

*See id.* § 78A–6–508(1)(b). Under subsection (1)(c), the trial court additionally found that prima facie evidence of abandonment existed because "[First Parents] failed to show the normal interest of a natural parent with [A.F.K.], sent no financial support, or even inquiries regarding her welfare without just cause for eleven (11) months." *See id.* § 78A–6–508(1)(c). The trial court further concluded that "[First Parents] failed to rebut th[e] clear and convincing evidence" supporting its conclusion of abandonment.

¶ 29 In reaching its decision, the trial court recognized that First Mother may "have held a silent desire to get [A.F.K.] back, which desire may have developed over a period of time." It determined, however, that "there was no clear manifestation of any intent to any third parties or to [Second Parents] ... that [First Parents] wanted to resume custody of [A.F.K.]" until the May 20, 2007, phone call. The trial court also reasoned that First Mother had received the relinquishment and consent forms and "was informed of these decisions, never objected to or sent responses opposing the same, and confirmed the action of her husband to allow adoption by her silence."

¶ 30 First Parents' only *factual* challenge to the trial court's ruling is to the trial court's determination that the temporary arrangement was for the purpose of an adoption rather than for respite care. First Parents, however, have not convinced us that this factual finding of the trial court was clearly erroneous because the email evidence expressly states that First Parents' initial intention was that the temporary arrangement would facilitate the subsequent adoption of A.F.K. While that intent may later have changed, the trial court's finding that any "silent desire" did not prevent a conclusion of abandonment is also sustainable in view of First Parents' objective actions and the fact that their secret intent went unex-

pressed.[20] *See In re J.C.O.,* 734 P.2d 458, 462 (Utah 1987) ("Abandonment may be proven by either objective evidence of the parent's conduct or by the *expressed,* subjective intent of the parent.") (emphasis added). *Cf. In re M.W.H.,* 794 P.2d 27, 29 (Utah Ct.App.1990) ("The subjective intent standard often focuses too much attention on the parent's wishful thoughts and hopes for the child and too little on the more important element of how well the parents have discharged their parental responsibility[.]") (citation and internal quotation marks omitted).

¶ 31 The trial court's determination that clear and convincing evidence established prima facie abandonment under subsections (1)(b) and (1)(c) of section 78A–6–508 is readily sustainable based on the facts that First Parents had no contact or communication with A.F.K. for thirteen months, did not inquire about her well-being for eleven months, and did not express a change in their desire that another family adopt A.F.K. until eleven months after they relinquished physical custody—facts which First Parents conceded. *See In re R.A.F.,* 863 P.2d 1331, 1334 (Utah Ct.App.1993) (discussing "[s]everal ... Utah cases [that] have found abandonment based solely on a parent's lack of visitation and communication"). Accordingly, even if a prima facie showing was not made under subsection (1)(a), we conclude that clear and convincing evidence established abandonment under subsections (1)(b) and (1)(c) of section 78A–6–508.

### 2. Destruction of the Parental Bond and A.F.K.'s Best Interest

¶ 32 The determination that there was prima facie evidence of abandonment due to lack of contact and failure to show the normal interest of a parent, which First Parents failed to rebut, clearly satisfies the first part of the abandonment test under our case law,

concern and interest in the child on a personal level, and that manifest a desire to continue a relationship with the child, will help provide proof of intent to maintain a parent-child relationship—even if direct communication with a very young child is impractical.

**20.** We further acknowledge First Father's contention that his email indicating Second Parents

could go ahead with the adoption was actually sent for the purpose of getting Second Parents to send the adoption papers back to First Parents to avoid Second Parents from adopting A.F.K. As this secret intent also was not expressed, the trial court did not err in relying on First Parents' *expressed* subjective intentions and objective actions.

see *In re J.R.T.*, 750 P.2d 1234, 1236 (Utah Ct.App.1988) (identifying first element of abandonment test as "whether the parent's conduct evidenced a conscious disregard for his or her parental obligations"). First Parents argue, however, that the second element of the abandonment test was not proven when the evidence showed that an attachment between A.F.K. and First Parents still existed.

¶ 33 Under the second element of our case law's abandonment test, a moving party must prove that a parent's "disregard for his or her parental obligations ... led to the destruction of the parent-child relationship." *Id.* Further, in termination cases generally, after proving that a ground for termination of parental rights exists, the moving party needs to establish that it is in the child's best interest for the parent's rights to be terminated. *See generally In re Adoption of T.H.*, 2007 UT App 341, ¶¶ 11, 15–16, 171 P.3d 480 (determining that even when a termination of parental rights issue arises during a contested adoption proceeding, a court must still determine whether the child's best interests will be served by terminating the parental rights). When a party proves that the parental bond was destroyed under the abandonment analysis, this showing ordinarily satisfies the best interest requirement necessary to terminate parental rights. *See In re J.R.T.*, 750 P.2d at 1238 ("The second prong of the objective abandonment test, whether the parental disregard led to the destruction of the parent-child relationship, satisfies the need separately to consider the best interest of the child. If the parent-child relationship has been destroyed by the parent's conduct, or lack of conduct, it is usually in the best interest of the child to terminate that relationship and allow the child an opportunity to establish a meaningful relationship with loving, responsible parents.").

¶ 34 According to First Parents, the trial court erred in concluding that abandonment occurred when evidence showed "that there was an appropriate and strong ... attachment and bond between A.F.K." and First Parents and that "the parent-child relationship ... remained intact." The evidence and factual findings, however, support the trial court's conclusion that the parental bond was destroyed for purposes of abandonment analysis.

¶ 35 The bonding study did show that A.F.K. and First Parents had a relationship and a measure of attachment, but the trial court determined that the attachment was a secondary attachment, not a primary attachment.[21] The court further found that a primary, parental attachment existed between A.F.K. and Second Parents. The trial court then found that the secondary attachment with First Parents "will never replace the primary attachment that is secured to [Second Parents]." It concluded that A.F.K. would experience "emotional trauma if ... removed from [Second Parents'] home" and that such removal would create "a high risk of reactive attachment disorder," which disorder might cause "developmental delays," trust issues with adults, problems at school, "poor peer relationships, creation of a parent/child void which would be difficult to repair, rejection from others, a cautious feeling that it is dangerous to get into warm adult relationships, dysfunctional behavior, and anxiety in the child for the rest of [her] life."

¶ 36 These findings indicate that any primary parental bond that developed between A.F.K. and First Parents while A.F.K. was in their care initially was destroyed, or completely replaced, by the primary attachment that developed with Second Parents. The findings also show that it would harm A.F.K. to remove her from Second Parents' care, and that it therefore is in her best interest to

---

**21.** We acknowledge that the bonding study concluded that the relationship between A.F.K. and First Parents was more like a parent-child relationship than other types of close relationships. In an effort to marshal the evidence, First Parents set forth evidence supporting the trial court's finding that the relationship was secondary, but they have failed to "ferret out a fatal flaw" in the supporting evidence. *See West Val-* *ley City v. Majestic Inv. Co.*, 818 P.2d 1311, 1315 (Utah Ct.App.1991). The trial court specifically indicated that, in this regard, it relied on expert testimony other than the bonding study. Moreover, even if some aspects of their relationship retained parent-child qualities, the conclusion that the relationship was secondary to the relationship A.F.K. had with Second Parents is amply supported by the evidence.

remain with Second Parents. Although A.F.K. still had a secondary, qualitatively different attachment to First Parents that was meaningful, this attachment does not mean a "parental" relationship existed with First Parents. The bonding study indicated that A.F.K. had an attachment to First Parents that had characteristics of a parent-child relationship, but the evidence does not make it entirely clear if any such attachment was the result of the court-ordered visitation following the thirteen-month physical absence or if such an attachment really persisted throughout the entire thirteen-month period of no contact. The trial-level guardian ad litem's observations, as discussed in footnote 7, suggest that the former situation occurred. It seems likely, especially given its contentious nature and how young A.F.K. was at the time, that the short-lived parent-child relationship that developed during the six months when A.F.K. lived with First Parents was destroyed over the course of the ensuing thirteen months when A.F.K. lived with—and thrived in the care of—Second Parents without any contact from First Parents. It seems likely that the warm and loving relationship that came into existence with First Parents after they re-entered A.F.K.'s life was not only secondary in importance but also of recent origin rather than a continuation of the initial parent-child relationship A.F.K. had with First Parents.

¶ 37 Furthermore, although an explicit termination-of-rights best interest analysis was not necessary under our case law in light of the trial court's determination that the parental bond was destroyed, *see In re J.R.T.*, 750 P.2d 1234, 1238 (Utah Ct.App.1988), the trial court's best interest determination on the legal guardianship issue further supports that termination of any rights First Parents had was in A.F.K.'s best interest.[22] In the past, this court has looked to a child's relationship with his or her current caregivers when determining if it is in the child's best interest to terminate his or her parent's rights. *See, e.g., In re M.W.H.*, 794 P.2d 27, 29–30 (Utah Ct.App.1990) (evaluating whether it was in the child's best interest to terminate his parent's rights and discussing that "the home in which [the child] currently lives provides a positive environment for him to grow and develop"; the child has been "a member of [the foster parents'] household since his birth ... [and] has become an integral part of their family"; the child "has bonded to [the foster parents'] other three children, as well as to the parents, the only caretakers he has ever known"; and "any disruption of the existing parent-child relationship would be devastating to [the child's] emotional, psychological, and behavioral condition"); *In re J.R.T.*, 750 P.2d at 1238–39 (evaluating the child's relationship with his foster family, and improvement under their care, when analyzing whether termination of his parent's rights was in his best interest).

¶ 38 The factual findings accordingly support that any parental bond A.F.K. may have had with First Parents was replaced by the bond with Second Parents and, thus, "destroyed" under our case law. The findings further support that termination of any parental rights First Parents had was in A.F.K.'s best interest.[23]

### III. The Trial Court's Best Interest Determination with Regard to Custody and Adoption by Second Parents

■ ¶ 39 In affirming the trial court's abandonment determination, we also affirm

---

22. In cases where parents are absent from a child for long periods of time without any communication, a conclusion that the parental bond was destroyed and that termination is in the child's best interest is the typical result. *See, e.g., In re R.A.F.*, 863 P.2d 1331, 1334–35 (Utah Ct. App.1993) (concluding parental bond was destroyed when father "visited the child only four or five times during a period of over two years," with no letters or phone calls, and when he "went to great lengths to avoid paying child support"); *In re J.R.T.*, 750 P.2d 1234, 1236–39 (Utah Ct.App.1988) (determining that it was in the best interest of the child to terminate parental rights when the parent abandoned the child, who was well-bonded and doing well with the foster family, and the facts showed the parent failed to contact the child for about fifteen months, did not comply with his treatment plan, and did not respond to numerous inquiries by the Division of Child and Family Services).

23. In light of our affirmance of the trial court's abandonment ruling, we also decline to disturb the trial court's ruling on First Parents' motion for summary judgment, concerning the expiration of the temporary guardianship agreement and First Parents' legal entitlement to the parental presumption.

its ultimate ruling that it is in A.F.K's best interest to remain in Second Parents' custody for the time being, even in light of the serious criminal charges against Second Parents, given the trial court's factual findings regarding A.F.K.'s primary attachment to Second Parents and the harm she will experience if removed from their care.[24] With regard to the criminal charges, counsel represented at oral argument that for Second Parents, personally, the charges were reduced to misdemeanor charges to which they pled guilty. While each will be on probation for five years, neither Second Mother nor Second Father is scheduled to serve time in jail or prison. A felony charge was said to be still pending against the Adoption Agency.[25]

¶ 40 In accordance with the trial court's ruling, we agree that a best interest hearing should now be held to determine whether adoption by Second Parents is in A.F.K.'s best interest in light of their conviction on misdemeanor charges. We also agree that, if the court concludes it is not in A.F.K.'s best interest for Second Parents to adopt her, First Parents should then at least be considered as potential adoptive parents.

### IV. Motion for New Trial and to Amend Judgment

¶ 41 First Parents argue that the trial court erred in failing to grant their motion for a new trial or to amend the judgment in light of new evidence. The new evidence was an affidavit from a former teacher of one of Second Parents' adopted children, who has special needs, which affidavit alleged that Second Parents were neglectful. The trial court denied First Parents' motion

> on the grounds that the evidence was discoverable prior to trial, could have been discovered with due diligence, and even if

presented at the trial, was not material to the case, was merely cumulative evidence and the credibility of the evidence due to time and distance (evidence is over 6 years old) was not credible or probative to the case.

¶ 42 Although the subject matter of the affidavit is indeed troubling, given the trial court's broad discretion to grant or deny a motion for a new trial or to amend the judgment, *see Smith v. Fairfax Realty, Inc.*, 2003 UT 41, ¶ 25, 82 P.3d 1064, *cert. denied*, 541 U.S. 960, 124 S.Ct. 1716, 158 L.Ed.2d 401 (2004); Utah R. Civ. P. 59(a), (e), we see no abuse of discretion given the trial court's reasoning, *see In re L.M.*, 2003 UT App 75, ¶ 8, 68 P.3d 276. We accordingly decline to disturb the trial court's ruling on this issue.

### CONCLUSION

¶ 43 If the trial court committed any error in failing to follow the law of the case, it was not prejudicial, as the trial court still engaged in the analysis necessary to determine that any parental rights First Parents had should have been terminated. We affirm the trial court's determination that First Parents abandoned A.F.K. because clear and convincing evidence established prima facie abandonment under subsections (1)(b) and (1)(c) of Utah Code section 78A–6–508, and the factual findings support that the parental bond was destroyed and A.F.K.'s best interest would be served by terminating any parental rights First Parents had. The trial court's ruling that A.F.K's best interest would be served if she were to remain in Second Parents' custody, pending an adoption hearing and further best interest analysis following the conclusion of the criminal case, is also sustainable. Finally, we affirm the trial court's denial of First Parents' mo-

---

24. First Parents argue that the trial court erred in its best interest analysis because it indicated that the standard of proof may have been "preponderance of the evidence" rather than "clear and convincing evidence." Any error in the trial court's statement of the standard, however, is harmless because it specifically determined that the evidence clearly and convincingly established that A.F.K.'s best interest would be served by granting temporary custody to Second Parents, thus satisfying the higher standard.

25. Subsequently, the Adoption Agency pled guilty to a felony conspiracy count and was ordered to dissolve. One published account reports that the federal district court recently ordered Second Parents to pay $85,000 into a trust fund to benefit the victims of the Adoption Agency's fraudulent scheme. We refrain from citing the source only because of the confidentiality that attends adoption proceedings.

tion for a new trial or to amend judgment because we cannot say the trial court abused its discretion in denying the motion.

¶ 44 Affirmed.

¶ 45 WE CONCUR: PAMELA T. GREENWOOD, Presiding Judge, and RUSSELL W. BENCH, Judge.