**2018 UT App 29**

# THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF J.A. AND C.A.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

C.A.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Amended Opinion[1]
No. 20160201-CA
Filed February 15, 2018

Second District Juvenile Court, Ogden Department
The Honorable Sherene T. Dillon
No. 1118574

Jason B. Richards, Attorney for Appellant

Sean D. Reyes and John M. Peterson, Attorneys
for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN authored this Opinion, in
which JUDGES KATE A. TOOMEY and DAVID N. MORTENSEN
concurred.

---

1. This Amended Opinion replaces the Opinion in Case No.
20160201-CA issued on December 7, 2017. After our original
opinion issued, the State of Utah and the Guardian ad Litem
filed petitions for rehearing, and we called for a response. We
grant the petitions for the limited purpose of removing one
footnote and deny the petitions in all other respects.

CHRISTIANSEN, Judge:

¶1     C.A. (Father) appeals from the juvenile court's adjudication order, in which the court found that Father had severely abused one of his children and neglected both of them. We affirm.

BACKGROUND[2]

¶2     Father and A.Z. (Mother) had two children—J.A. (Older Child) and C.A. (Younger Child). Older Child was born in November 2012, and Younger Child was born in April 2015.

¶3     On July 21, 2015, Mother left for work around 7:30 a.m., leaving Father at home to care for the children. Younger Child was awake and smiling when Mother left.

¶4     According to Father, Younger Child took a nap from 9:30 to 11:30 a.m., and both children took naps around 1:00 p.m. As Father watched television, he heard a "choking" sound coming from Younger Child's room and went to check on him. Father took Younger Child into the living room. Younger Child was limp and did not appear to be breathing. According to Father, he unsuccessfully attempted CPR and called 911.

¶5     The first responding officer observed that Younger Child was nonresponsive, that his arms were "straight out in front" of him, that his "hands were locked," and that he had very shallow breathing. The officer later testified that Father told him that he "shook [Younger Child] a little bit" to try to clear his airways.

---

2. We recite the facts as found by the juvenile court. *See In re O.D.*, 2006 UT App 382, ¶ 2 n.1, 145 P.3d 1180.

¶6    An ambulance transported Younger Child to a local hospital, where a CT scan revealed that he had a subdural hematoma. The hospital requested an airlift to Primary Children's Medical Center (PCMC), where doctors stabilized Younger Child and performed additional tests and scans on him. The additional testing revealed that Younger Child had two subdural hematomas, one older and one more recent. He also had retinal hemorrhaging, fractured ribs, and a neck injury. The incident ultimately left Younger Child with significant and permanent brain damage.

¶7    Police obtained search warrants for the family's house and for the parents' cell phones. After conferring with physicians at PCMC, who ultimately concluded that Younger Child's injuries were the result of nonaccidental trauma, police officers arrested Father. The State obtained a warrant to take both children into custody and filed a verified petition alleging abuse and neglect based on the July 21, 2015 incident.

¶8    The police extracted several text messages from each parent's cell phone. A detective (Detective) sifted through the texts and compiled the ones he believed were relevant to the investigation. For example, in a June 24, 2015 text to Mother, Father stated, "I think you should take the kids. He is getting me to a new level." Mother responded, "[D]o whatever you need to get away and take a break." And in a June 27, 2015 text, Father sent Mother a picture of a bruise on Younger Child's neck. Mother responded with "W.T.F." and "OMG . . . that is a really bad bruise."

¶9    In December 2015, the juvenile court held a four-day adjudication trial. Father testified that he watched the children about half of the time. Father added that Younger Child had choking issues from birth and had also been diagnosed with acid reflux. He denied ever "shaking" Younger Child, stating that he only ever "slight[ly] bounce[d]" Younger Child to help him clear

his airways. In an apparent attempt to explain Younger Child's rib injuries, Father testified that about a week before the incident, Mother had been driving and was forced to slam on the brakes to avoid a collision. Father testified that Younger Child was sleeping in the car at the time and did not wake up or cry.

¶10     Regarding Younger Child's neck injury, Father described an incident in which Older Child had allegedly tripped over Younger Child. Father stated that Younger Child seemed "startled" after Older Child tripped over him, but that he did not cry. Father told Mother about the incident via text message. Father admitted that he had initially lied to her about what had happened; he told her that Younger Child had gotten the bruise by lying on his pacifier. Father also discussed his text messages with Mother regarding a bruise on Younger Child's forehead and stated that the forehead bruise came from the same tripping incident. Father acknowledged that Younger Child's injuries were "pretty severe," but he denied causing them.

¶11     The first responding officer testified about what he had witnessed when he arrived at the family's house on the day of the incident. Although the first responding officer testified that Father admitted he "shook [Younger Child] a little bit" to try to get him to respond, another officer stated that Father told him that Father had "jiggled and bounced" Younger Child and "flatly" denied shaking Younger Child. While he was in the house, the first responding officer heard a sound coming from another room. When he opened the door he found Older Child, who had been locked inside the room with a child-proof lock. The room smelled like urine. Father was upset that the officer had opened Older Child's door and stopped the officer from talking to Older Child. Father told Older Child to "remember what I told you." The officer described the family's house as "cluttered" but "not overly dirty."

¶12    A second responding officer testified that he observed Father arguing with the first responding officer about why he had opened Older Child's bedroom door. The second officer testified that Father was more concerned with the police presence than with Younger Child's welfare. Father asked the first responding officer to leave several times, stating that he "didn't want police there."

¶13    The first responding officer further testified that he had executed the warrant to seize the parents' cell phones. The officer stated that he had taken the phones, turned them off, removed the batteries, and given them to detectives.

¶14    Detective testified that a "data dump" was performed on the phones and that he had been provided with two thumb drives containing "all of the content from those phones." Detective "looked through all the messages, the pictures, . . . [and] the videos and put the content together for the text messages leading up to and the day of the incident that occurred." He testified that he "didn't include all of the texts" in his police report; he only included "texts [he] felt [were] relevant to this case and with communication between [Father] and [Mother] or anybody else that would have had anything to do with [Younger Child] and [his] health and well-being."

¶15    Three medical experts testified at the trial. The head of the Safe and Healthy Families Team at PCMC (Doctor) testified for the State. Doctor testified generally about "shaken baby syndrome" and clarified that it was properly referred to as "abusive head trauma." Doctor testified that none of the parents' explanations adequately accounted for Younger Child's injuries.

¶16    Doctor testified in detail about Younger Child's injuries. She testified that Younger Child suffered retinal hemorrhages in both of his eyes and that "this particular pattern where it's in multiple layers of the retina and goes all the way out to the aura

is specific—not entirely specific, but very specific for rotational injury by shaking." Doctor observed that Younger Child's CT scan showed that he had an older subdural hematoma, but she testified that it was unlikely that the newer hematoma was a "re-bleed of the chronic ones" based on Younger Child's symptoms. Doctor also testified regarding other possible causes for Younger Child's injuries, but she stated that "nothing seemed to fit the pattern of anything other than abusive head trauma and physical abuse to explain all of [Younger Child's] injuries." Doctor explained that a baby like Younger Child "would have symptoms immediately after having sustained these injuries."

¶17 A board-certified radiologist (Radiologist) testified for the State regarding Younger Child's rib fractures. He testified that x-rays showed calcification of Younger Child's rib fractures, which is indicative of healing. He also testified that the fractures would not have been caused by Father's attempts at CPR. Radiologist testified that Younger Child's rib injuries appeared to be "about seven to fourteen days" old as of the July 21, 2015 incident. He ruled out rickets as the cause of Younger Child's rib injuries.[3]

¶18 At the close of the State's case-in-chief, Father moved for involuntary dismissal pursuant to rule 41(b) of the Utah Rules of Civil Procedure. Father argued that the State had failed to provide clear and convincing evidence that he was responsible for Younger Child's injuries. Father also argued that the Juvenile Court Act was unconstitutional as applied to him. The court denied Father's motion for involuntary dismissal and took his

---

3. "Rickets is the softening and weakening of bones in children, usually because of an extreme and prolonged vitamin D deficiency." Mayo Clinic, *Rickets*, https://www.mayoclinic.org/diseases-conditions/rickets/symptoms-causes/syc-20351943 [https://perma.cc/N26A-C7PW].

constitutional argument under advisement, stating that it would decide those issues after all of the evidence had been presented.

¶19 Thereafter, Father's expert (Father's Expert) testified that all of Younger Child's subdural hematomas were the result of a "re-bleed" from a subdural hematoma that likely occurred during Younger Child's birth, combined with rickets. Father's Expert acknowledged that, while he had considerable experience as an emergency room physician, he had no special training in diagnosing child abuse and was not a trained radiologist. On rebuttal, Doctor disagreed with Father's Expert that Younger Child's newer subdural hematoma was the result of a "re-bleed." Doctor explained that the entire collection of Younger Child's injuries, including subdural hematomas, 360-degree multilayer retinal hemorrhaging, neck injury, and rib fractures, could reasonably be explained only by traumatic shaking incidents.

¶20 In March 2016, the juvenile court entered an order adjudicating both children as neglected by the parents. The court found that Younger Child had suffered two rib fractures within a two-week period surrounding his "acute injuries." In addition, the court found that Younger Child had been severely abused by Father. The court rejected Father's argument regarding the constitutionality of the Juvenile Court Act.

¶21 On January 6, 2017, the juvenile court terminated Father's parental rights on the grounds that (1) Father had "abandoned his children and failed to show the normal interest of a natural parent"; (2) Father had "severely abused or neglected" the children; (3) Father was an "unfit or incompetent parent[]"; (4) Father had "been unable or unwilling to remedy the circumstances that caused the children to be in an out-of-home placement" and there was a "substantial likelihood that [he would] not be capable of exercising proper and effective parental care in the near future"; (5) Father's actions constituted a failure of parental adjustment; and (6) Father had "made only token

efforts to support or to communicate with the children." As far as this court is aware, Father has not appealed from the juvenile court's order terminating his parental rights in the children. Father's appeal in this case is from the juvenile court's order adjudicating the children as abused and neglected.

ISSUES AND STANDARDS OF REVIEW

¶22    First, Father contends that the juvenile court erred by denying his motion for involuntary dismissal. When reviewing the denial of a motion for involuntary dismissal, we review the juvenile court's factual findings and inferences for clear error and its legal conclusions for correctness. *Brady v. Park*, 2013 UT App 97, ¶ 14, 302 P.3d 1220.

¶23    Second, Father contends that the juvenile court erred by denying his motion to find that the Juvenile Court Act (the Act) is unconstitutional. More specifically, Father argues that the Act is unconstitutional because it "fails to properly outline the elements of committing severe child abuse." In a related but separate argument, Father further argues that the Act is unconstitutional because it "does not require the juvenile court to make any type of finding regarding the mental intent of the purported perpetrator of severe abuse." "'Constitutional challenges to statutes present questions of law, which we review for correctness.'" *Jones v. Jones*, 2013 UT App 174, ¶ 7, 307 P.3d 598 (quoting *State v. Green*, 2004 UT 76, ¶ 42, 99 P.3d 820), *aff'd*, 2015 UT 84, 359 P.3d 603. "Nevertheless, 'legislative enactments are presumed to be constitutional, and those who challenge a statute or ordinance as unconstitutional bear the burden of demonstrating its unconstitutionality.'" *Id.* (quoting *Green*, 2004 UT 76, ¶ 42).

¶24    Third, Father contends that the juvenile court erred by "allowing text messages to be read into the record without any

foundation." We review the juvenile court's interpretation and application of a rule of evidence for correctness. *See Utah Dep't of Transp. v. TBT Prop. Mgmt., Inc.*, 2015 UT App 211, ¶ 15, 357 P.3d 1032; *see also State v. Griffin*, 2016 UT 33, ¶ 14, 384 P.3d 186 (applying a correctness standard to "legal questions underlying the admissibility of evidence" (citation and internal quotation marks omitted)).

ANALYSIS

## I. Father's Motion for Involuntary Dismissal

¶25 Father contends that "[t]he juvenile court committed error in denying [his mid-trial] motion for involuntary dismissal under [Utah Rule of Civil Procedure] 41(b)." According to Father, the juvenile court should have granted his motion because the State "did not establish that Father caused [Younger Child's] severe injuries, but rather only offered circumstantial evidence that [Younger Child's] injuries may have been caused by Father."

¶26 In a bench trial, after the plaintiff "has completed the presentation of his evidence[,] the defendant . . . may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." Utah R. Civ. P. 41(b) (2015)[4]; *see also Grossen v. DeWitt*, 1999 UT App 167, ¶ 8, 982 P.2d 581 ("In the context of a bench trial, . . . where there is no jury

---

4. Utah Rule of Civil Procedure 41 was amended in November 2016. "[T]he 2016 amendments move a central provision of paragraph (b) from [rule 41] to Rule 52(e)." Utah R. Civ. P. 41 (2017) advisory committee note to 2016 amendments; *see also id.* R. 52(e) (2017). For clarity, we cite the rule that was in effect at the time Father made his motion.

verdict, the directed verdict's counterpart is a motion to dismiss."). "Under Rule 41(b), the court may dismiss if (1) the claimant has failed to introduce sufficient evidence to establish a prima facie case, or (2) the trial court is not persuaded by that evidence." *Grossen*, 1999 UT App 167, ¶ 8 (citation and internal quotation marks omitted).

¶27 Father asserts that his motion was "based upon a lack of evidence to support the allegation that he had directly inflicted injury on [Younger Child]. No forensic evidence, further eyewitness testimony, nor any confession from Father that he shook or abused [Younger Child] was offered." Thus, according to Father, "the State failed to establish a prima facie case that [Younger Child's] injuries [were] a direct result of the Father and being in his care." "[T]he determination of whether a party has made out a prima facie case is a question of law which we review for correctness, affording no deference to the trial court's judgment." *Brady v. Park*, 2013 UT App 97, ¶ 48, 302 P.3d 1220 (citation and internal quotation marks omitted). "A prima facie case has been made when evidence has been received at trial that, in the absence of contrary evidence, would entitle the party having the burden of proof to judgment as a matter of law." *Id.* (citation and internal quotation marks omitted).

¶28 As a preliminary consideration, we note that Father appears to be arguing that circumstantial evidence is insufficient as a matter of law to survive a motion for involuntary dismissal. Indeed, according to Father, the evidence that he caused Younger Child's injuries "was only circumstantial at best."

¶29 The State concedes that its case "was largely based upon circumstantial evidence." But it is well-settled that circumstantial evidence may be sufficient in both criminal and civil proceedings. *See, e.g.*, *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 100 (2003) ("Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct

evidence." (citation and internal quotation marks omitted)); *id.* ("The adequacy of circumstantial evidence also extends beyond civil cases; we have never questioned the sufficiency of circumstantial evidence in support of a criminal conviction, even though proof beyond a reasonable doubt is required."); *State v. MacNeill*, 2017 UT App 48, ¶ 57, 397 P.3d 626 ("[T]he idea that circumstantial evidence is necessarily less convincing and of less value than direct evidence is a misstatement of the law." (ellipsis, citation, and internal quotation marks omitted)); *In re Z.D.*, 2007 UT App 33, ¶¶ 14–15, 156 P.3d 844 (affirming the juvenile court's conclusion that the father nonaccidentally injured the child where testimony indicated that the child was in the father's sole care when the child's injury occurred and the father "provided no nonaccidental explanation for [the child's] injury").

¶30    Father contends that the State "did not establish that Father caused [Younger Child's] severe injuries." After reviewing the record, we conclude that the State presented sufficient circumstantial evidence demonstrating that Father caused Younger Child's severe injuries.[5]

---

5. The parties have not addressed whether we should only review the evidence up to the time that the juvenile court denied Father's motion for involuntary dismissal, i.e., at the conclusion of the State's case-in-chief, or whether we should review the entire record before us. *See State v. Kihlstrom*, 1999 UT App 289, ¶ 9, 988 P.2d 949 (observing, where the defendant's appeal focused on the denial of a motion to dismiss at the close of the State's case-in-chief, that the court's "review of the sufficiency of the evidence is limited to the evidence adduced by the prosecution in its case-in-chief"). *But see State v. McCallie*, 2016 UT App 4, ¶¶ 42, 44, 369 P.3d 103 (suggesting that the Utah Supreme Court adopted the waiver rule in *State v. Stockton*, 310 P.2d 398 (Utah 1957), and observing that under the waiver rule,

(continued…)

¶31 Mother testified that on the day of the incident, Younger Child was awake and smiling when she left for work. The children were then in Father's exclusive care. When first responders arrived several hours later, Younger Child was nonresponsive, his arms were "straight out in front" of him, his "hands were locked," and he had very shallow breathing. According to the first responding officers, Father was more concerned that police were in his house and that they tried to talk with Older Child than he was with Younger Child's welfare.

¶32 A CT scan revealed that Younger Child had two subdural hematomas, one older and one newer. He also had retinal hemorrhages in both of his eyes and rib fractures. Doctor testified that Younger Child's injuries were life-threatening and that "the one explanation that explains everything is that [Younger Child] was abused, that he was shaken."

¶33 Father asserts, and the State appears to agree, that Younger Child's rib injuries had occurred at least two weeks prior to the incident in question. The evidence bears this out. Radiologist testified that x-rays showed calcification of Younger Child's rib fractures, which is indicative of healing. He also testified that the fractures would not have been caused by Father's attempts at CPR. Radiologist opined that Younger

---

(…continued)
"if the defendant elects to introduce evidence following the denial of a motion for a judgment of acquittal, appellate review of the defendant's conviction encompasses all of the evidence presented to the jury, irrespective of the sufficiency of evidence presented during the state's case-in-chief" (citation and internal quotation marks omitted)), *cert. granted*, 384 P.3d 567 (Utah 2016). In arguing that the juvenile court erred in denying his motion for involuntary dismissal, Father relies only on the evidence presented in the State's case-in-chief. We follow suit.

Child's rib injuries appeared to be "about seven to fourteen days" old as of the July 21, 2015 incident. He also ruled out rickets as the cause of Younger Child's rib injuries. Father asserts that, apart from Younger Child's rib injuries being an older injury, "[n]o testimony was offered by the State or [DCFS] to show who was caring for [Younger Child] during that specific time period." While this may be true, we ultimately agree with the State that even if Younger Child's rib injuries could have been caused by someone other than Father, there was sufficient evidence demonstrating "that [Younger Child] suffered the final acute life-threatening injury while in the sole care of [Father]."

¶34 Doctor testified that Younger Child had "chronic, so older, subdural hemorrhages on each side of his head" and "a newer subdural hemorrhage on the right side of his head going up over the top and covering the part of the brain that is in the front and on the side of his head on the right." She stated that the most common cause for a subdural hematoma is trauma and that it was significant that Younger Child had hemorrhages on both sides of his head, because with abusive head trauma, "most commonly it is on both sides of the head." Doctor clarified that "[l]ess commonly, but still frequently[,] it's on one side of the head." She further testified that about "40 to 50 percent of babies with no symptoms at all" can have a subdural hemorrhage that is caused by the birthing process, but "that is generally gone . . . by about a month of age." According to Doctor, it was not likely that Younger Child's newer hematoma was the result of a "re-bleed of the chronic ones" based on the symptoms he had when he was admitted to PCMC: "This is what we see with new trauma." Doctor acknowledged that a "birth trauma related subdural hematoma" could be mistaken for abusive head trauma, but she stated that she would have noticed that because "[w]hen chronic subdurals re-bleed, the clinical picture is not one of devastation, of symptomatic problems like [Younger Child] had, like limpness, like seizures, like poor breathing. It's without symptoms."

¶35   Doctor refuted Father's explanation for Younger Child's neck bruise, testifying that the bruise looked "like something was squeezing [his] neck or a t-shirt was pulled on." She further testified that it was unlikely that the incident where Mother had slammed on the car brakes caused any of Younger Child's injuries, observing that the parents had told her that Younger Child slept through the incident and did not cry.

¶36   Regarding the retinal hemorrhages in each of Younger Child's eyes, Doctor testified that "this particular pattern where it's in multiple layers of the retina and goes all the way out to the aura is specific—not entirely specific, but very specific for rotational injury by shaking." She discussed other possible causes of retinal hemorrhaging and stated that she always considers other possibilities besides abuse or trauma in making a diagnosis.

¶37   Doctor also testified regarding other possible causes for Younger Child's injuries generally, including bleeding disorders, metabolic disorders, "benign extra axial fluid of infancy," and growth curves of the head, but she further stated that "nothing seemed to fit the pattern of anything other than abusive head trauma and physical abuse to explain all of [Younger Child's] injuries." Doctor explained that a baby "would have symptoms immediately after having sustained these injuries." She further stated that, as of the time of trial, Younger Child was receiving seizure treatment, had to be fed via a "gastrostomy tube" due to his trouble with swallowing "because of his brain trauma," had left-sided cerebral palsy, and that "there were signs of encephalomalacia starting," i.e., "where the brain has died." She stated that it was her opinion that Younger Child had permanent brain damage.

¶38   Mother's father (Grandfather) testified that Father told him at the hospital that "they were going to pin this on him" and that both parents "started making . . . up stories to go with

whatever the doctor just said." For example, "when the doctor was saying, that there was a problem [with Younger Child's] ribs, . . . they thought they were broken. . . . [Father and Mother] started, well it could have been from this, and . . . they were just changing their stories to match whatever was being said." According to Grandfather, Father and Mother also asked Grandfather's "son and . . . [Mother's sister] to tell [Grandfather] a story—to tell [him] about an accident—that they didn't know anything about" to explain how Younger Child received his injuries.

¶39 In addition, the record indicates that prior to the incident in question, there were no major concerns listed in Younger Child's medical records other than a reference to acid reflux. The officer who interviewed Father at the hospital testified that Father had told him that Younger Child "had been in for a well child check within the last several weeks and the baby checked out fine." Although Mother and Father testified that Younger Child had choking episodes, neither Grandfather nor Mother's sister had ever witnessed one of these alleged choking spells. And in any event, Doctor testified that she did not think that choking would have "cause[d] the subdural hemorrhages or the retinal hemorrhages or the rib fractures."

¶40 Based on the foregoing, we conclude that there was sufficient circumstantial evidence demonstrating that Father was responsible for Younger Child's severe injuries. The record indicates that Younger Child was fine when Mother left for work on the day of the incident, that Younger Child was in Father's exclusive care throughout the day, and that by the time Father called 911, Younger Child had suffered life-threatening injuries that have left him with permanent brain damage. Although Father denied shaking Younger Child, he failed to provide a reasonable alternative explanation for Younger Child's devastating injuries. Accordingly, the juvenile court correctly denied Father's motion for involuntary dismissal.

## II. The Constitutionality of the Act

¶41    Father next contends that "[t]he juvenile court committed error in denying [his] motion to deem the Act unconstitutional, on its face and as applied to him, since it fails to properly outline the elements of committing severe child abuse." More specifically, Father asserts that "the Act is not narrowly tailored to achieve the statutory interest of protecting children, because the Act does not outline what particular elements must be proven for the court to enter a finding of 'abuse' or 'severe abuse' against a parent or caregiver. It lists no physical act, no mental state, no guidance at all." In support of this argument, Father asserts that the Act is unconstitutionally vague.

¶42    The juvenile court adjudicated Older Child as neglected and Younger Child as neglected and severely abused. As Father correctly observes, the court's adjudication of Younger Child as severely abused gave rise to a statutory presumption that reunification services would not be provided to Father. Section 78A-6-312(20) of the Act provides, in relevant part,

> There is a presumption that reunification services should not be provided to a parent if the court finds, by clear and convincing evidence, that any of the following circumstances exist:
>
> . . . .
>
> (e) the minor suffered severe abuse by the parent or by any person known by the parent, if the parent knew or reasonably should have known that the person was abusing the minor; [or]
>
> (f) the minor is adjudicated an abused child as a result of severe abuse by the parent, and the court finds that it would not benefit the minor to pursue reunification services with the offending parent[.]

Utah Code Ann. § 78A-6-312(20)(e), (f) (LexisNexis Supp. 2016). Father asserts that this presumption against reunification services "is devastating to a parent, because it virtually begins the process that will ultimately end in the permanent deprivation of his/her parental rights." Father contends that the Act fails to "outline what elements must be proven for a parent to be found liable for child abuse in a civil context," and that it is therefore "not narrowly tailored to achieve an important government purpose."

¶43    "[T]he interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court." *Jones v. Jones*, 2013 UT App 174, ¶ 10, 307 P.3d 598 (alterations and omission in original) (quoting *Troxel v. Granville*, 530 U.S. 57, 65 (2000) (plurality opinion)), *aff'd*, 2015 UT 84, 359 P.3d 603. "Parents have a fundamental right 'to make decisions concerning the care, custody, and control of their children.'" *Id.* (quoting *Troxel*, 530 U.S. at 66). "The Utah Constitution similarly protects this fundamental right. 'In a long line of precedent, [the Utah Supreme Court] has recognized parental rights as a fundamental component of liberty protected by article I, section 7 [of the Utah Constitution].'" *Id.* ¶ 11 (alterations in original) (quoting *Jensen ex rel. Jensen v. Cunningham*, 2011 UT 17, ¶ 72, 250 P.3d 465). Consequently, "[a] statute that infringes upon this 'fundamental' right is subject to heightened scrutiny and is unconstitutional unless it (1) furthers a compelling state interest and (2) the means adopted are narrowly tailored to achieve the basic statutory purpose." *Jensen*, 2011 UT 17, ¶ 72 (citation and additional internal quotation marks omitted).

¶44    "It is equally well established, however, that although 'fundamental,' parental rights are not absolute. A parent's rights must be balanced against the state's important interest in protecting children from harm." *Id.* ¶ 74; *see also In re J.P.*, 648 P.2d 1364, 1382 (Utah 1982) (Stewart, J., dissenting) ("[T]he

correlative of parental rights is parental duties. When parents fail to, or are incapable of, performing their parental obligations, the child's welfare must prevail over the right of the parent."); *see also id.* at 1381 ("[O]nce the welfare of the child is threatened, it is the child's welfare, not the interest of the parents, which predominates.").

¶45    Father does not dispute that the State has a compelling interest in protecting children from abuse and neglect. *See generally* Utah Code Ann. § 62A-4a-201(2) (LexisNexis Supp. 2016) ("It is also the public policy of this state that children have the right to protection from abuse and neglect, and that the state retains a compelling interest in investigating, prosecuting, and punishing abuse and neglect . . . . There may be circumstances where a parent's conduct or condition is a substantial departure from the norm and the parent is unable or unwilling to render safe and proper parental care and protection. Under those circumstances, the state may take action for the welfare and protection of the parent's children."); *Jones*, 2013 UT App 174, ¶ 26 ("The classic justification for state intervention in the parent-child relationship is to protect a child who is an abused child, neglected child, or dependent child[.]" (citation and internal quotation marks omitted)); *In re S.A.*, 2001 UT App 307, ¶ 25, 37 P.3d 1166 (observing that "the State's interest in . . . a child potentially at risk of abuse or neglect, is of prime import"). Rather, he focuses on the second prong of the heightened-scrutiny test, i.e., whether the Act is "narrowly tailored to achieve the basic statutory purpose." *See Jensen*, 2011 UT 17, ¶ 72. The question is therefore whether the Act is narrowly tailored to attain the compelling legislative goal of protecting children from abuse and neglect.

¶46    In attempting to answer this question, Father asserts that the Act is unconstitutionally vague because it fails to give adequate notice of that conduct which is proscribed. Father argues that the Act "lists no physical act, no mental state, no

guidance at all." "Vagueness questions are essentially procedural due process issues, i.e., whether the statute adequately notices the proscribed conduct." *State v. MacGuire*, 2004 UT 4, ¶ 14, 84 P.3d 1171 (citation and internal quotation marks omitted). "[T]he Utah Supreme Court has held that a statute is not unconstitutionally vague if it is sufficiently explicit to inform the ordinary reader what conduct is prohibited and does so in a manner that does not encourage arbitrary and discriminatory enforcement."[6] *State v. Krueger*, 1999 UT App 54, ¶ 23, 975 P.2d 489.

¶47     Based on the Act's definitions of abuse, harm, and severe abuse, we conclude that the Act is "sufficiently explicit to inform the ordinary reader what conduct is prohibited." *See id.* Section 78A-6-105 of the Act defines "[a]buse," in relevant part, as "nonaccidental harm of a child." Utah Code Ann. § 78A-6-105(1)(a)(i) (LexisNexis Supp. 2016). "Harm" means, in relevant part, "physical or developmental injury or damage." *Id.* § 78A-6-105(19)(a). And "'[s]evere abuse' means abuse that causes or threatens to cause serious harm to a child." *Id.* § 78A-6-105(37).

¶48     While the Act does not draw a bright line between abuse and severe abuse, it is evident from the definitions of abuse and severe abuse that severe abuse is something more than "simple" abuse. The fact that the Act does not describe specific physical acts that constitute abuse versus severe abuse does not render the Act unconstitutionally vague. *See generally People v. D.A.K.*, 596 P.2d 747, 751 (Colo. 1979) ("An ordinarily reasonable parent can understand what it means to 'abuse' and 'mistreat' a child. Fundamental fairness does not require a statute to enumerate in all-encompassing examples, or exactly described acts, precisely

---

6. Father does not argue that the Act promotes arbitrary and discriminatory enforcement. *See State v. Krueger*, 1999 UT App 54, ¶ 23, 975 P.2d 489.

how poorly a parent can treat a child before risking losing parental rights."); *Simons v. Department of Human Services*, 2011 ND 190, ¶ 30, 803 N.W.2d 587 ("A statute is not unconstitutionally vague merely because it does not specifically state all of the various ways it may be violated.").

¶49 Indeed, in *In re L.P.*, 1999 UT App 157, 981 P.2d 848, this court observed that because "all children, parents and circumstances are different," "*the broad definition of an abused child . . . is necessary*, and . . . the focus of the juvenile court should be on evidentiary findings to determine whether, by clear and convincing evidence, a child has suffered or been threatened with nonaccidental physical or mental harm." *Id.* ¶ 7 (emphasis added) (citation and internal quotation marks omitted). The court further observed that because there is "a myriad of circumstances with countless permutations, which may or may not justify intervention of the juvenile court, *it is essential that the definition of an abused child remain broad* so the juvenile court can effectively apply section [78A-6-103(1)(c)]."[7] *Id.* (emphasis added); *see also Simons*, 2011 ND 190, ¶ 31 (concluding, in the context of a vagueness challenge to a child abuse statute, that "[t]he statute need not set out in explicit detail all factual scenarios that would fall within its reach; it need only give adequate and fair warning, when measured by the common understanding and practice of a 'reasonable person,' of the proscribed conduct"). Although the Act does not "set out in explicit detail all factual scenarios that would fall within its reach," we nevertheless conclude that the Act's definitions of abuse and severe abuse provide the kind of notice that enables

---

7. As previously discussed, section 78A-6-103(1)(c) provides the juvenile court with exclusive, original jurisdiction in proceedings concerning "an abused child, neglected child, or dependent child, as those terms are defined in Section 78A-6-105." Utah Code Ann. § 78A-6-103(1)(c) (LexisNexis 2012).

ordinary readers to understand what conduct is statutorily prohibited.[8] *See Simons*, 2011 ND 190, ¶ 31. The Act defines "harm" and requires that the harm be nonaccidental. *Supra* ¶ 47. Moreover, with regard to the facts of this case, Father does not argue that his behavior, which resulted in Younger Child's permanent brain damage, somehow fell on the "safe" side of the severe-abuse line; indeed, Father acknowledged below that Younger Child's injuries were "pretty severe."

¶50 Because the Act is sufficiently explicit to inform the ordinary reader what conduct is prohibited, it is not unconstitutionally vague. *See Krueger*, 1999 UT App 54, ¶ 23.

¶51 Father also argues that "the Act [is] unconstitutional because it does not require any proof or evidence of mental intent when making a finding of abuse against a parent." The

---

8. As a general matter, we note that the Act is not unconstitutionally overbroad, because it does not prohibit any constitutionally protected behavior. "Statutory overbreadth . . . is a substantive due process question which addresses the issue of whether the statute in question is so broad that it may not only prohibit unprotected behavior but may also prohibit constitutionally protected activity as well." *Board of Comm'rs of Utah State Bar v. Petersen*, 937 P.2d 1263, 1268 (Utah 1997) (omission in original) (citation and internal quotation marks omitted). Section 78A-6-105(1)(c) specifically exempts "reasonable discipline or management of a child" from the definition of abuse, and thus the Act does not prohibit protected behavior, i.e., the Act does prohibit parents from reasonably disciplining their children and a parent's use of reasonable discipline may not provide the basis for a finding that a child has been abused. *See generally In re L.P.*, 1999 UT App 157, ¶ 15, 981 P.2d 848 (Bench, J., concurring) ("[O]ur common law dictates that reasonable discipline by a parent cannot constitute abuse.").

State, on the other hand, contends that "the civil offense of child abuse is based on a child's status as abused, not on the parent's intent to harm the child," and that "[t]he purpose of civil child welfare adjudication does not require a parent to form specific intent prior to committing abuse." We agree with the State.

¶52    In making his argument, Father observes that the statute governing child abuse in criminal proceedings "mandates that the prosecutor prove intent beyond a reasonable doubt when alleging severe abuse":

> Any person who inflicts upon a child serious physical injury or, having the care or custody of such child, causes or permits another to inflict serious physical injury upon a child is guilty of an offense as follows:
>
>> (a) if done intentionally or knowingly, the offense is a felony of the second degree;
>>
>> (b) if done recklessly, the offense is a felony of the third degree; or
>>
>> (c) if done with criminal negligence, the offense is a class A misdemeanor.

Utah Code Ann. § 76-5-109(2) (LexisNexis 2012).

¶53    Utah courts have previously recognized that "the focus of a criminal trial is quite different than that of a child welfare proceeding." *In re C.B.*, 2013 UT App 7, ¶ 11, 294 P.3d 670. A child welfare proceeding "is a civil proceeding designed by our legislature to protect the child and to assist the family in resolving difficulties that endanger the child. It is not a criminal trial of the accused abuser." *In re Z.D.*, 2006 UT 54, ¶ 56, 147 P.3d 401 (Wilkins, J., concurring in the result). Accordingly, Utah courts have declined to apply criminal statutes in civil child

welfare proceedings. *See, e.g., In re L.P.*, 1999 UT App 157, ¶ 6, 981 P.2d 848 ("It is incumbent upon the juvenile court to apply the proper definition from the appropriate statute. . . . [W]e are not reviewing a criminal case and therefore criminal statutes are inapplicable. . . . Here, we are reviewing a juvenile court proceeding held to determine whether that court may assert jurisdiction over [the child], and the concept of varying definitions for varying purposes is not foreign to our jurisprudence." (citation omitted)); *In re A.R.*, 1999 UT 43, ¶¶ 18–20, 982 P.2d 73 (rejecting the petitioner's argument that a child protection proceeding was "quasi-criminal in nature," observing that "[t]he primary focus of and sole statutory justification for child protection proceedings is to protect the interests of children who are neglected or abused," and concluding that "the Fourth Amendment exclusionary rule is inapplicable to child protection proceedings" given the "purpose of the exclusionary rule, as well as the State's interest in protecting children"); *Ibarra v. Holder*, 736 F.3d 903, 905 (10th Cir. 2013) ("The purpose of civil definitions is to determine when social services may intervene. The purpose of criminal definitions is to determine when an abuser is criminally culpable."). Based on the foregoing, we conclude that the juvenile court appropriately declined to apply the criminal definition of child abuse to the case at hand.

¶54 Moreover, we disagree with Father's assertion that the Act "does not require any proof or evidence of mental intent." As previously discussed, the Act defines abuse, in relevant part, as "nonaccidental harm of a child." Utah Code Ann. § 78A-6-105(1)(a)(i) (LexisNexis Supp. 2016). The term "nonaccidental" encompasses anything that is not an accident. Thus, the parent may cause the abuse intentionally, knowingly, or recklessly. Although Father asks this court to determine which specific mental state applies in the civil child-abuse context, we think the term "nonaccidental" appropriately encompasses the three relevant mental states. This reading of the Act comports with the

State's compelling interest in protecting children from abuse and neglect; so long as the abuse was caused by the intentional, knowing, or reckless acts of the parent, the Act applies to the child.

¶55 Because the Act's definitions are sufficiently explicit to inform an ordinary reader what conduct is prohibited, we conclude that the Act is not unconstitutionally vague. And because the Act protects only those children who have been nonaccidentally abused or nonaccidentally severely abused by their parents, we conclude that the Act is narrowly tailored to attain the compelling legislative goal of protecting children from abuse.[9] The juvenile court therefore did not err in denying Father's motion to deem the Act unconstitutional.

### III. The Text Messages

¶56 Lastly, Father contends that "[t]he juvenile court committed error in allowing text messages to be read into the record without the proper foundation and chain of custody." Father also observes that "[t]he text messages that had been testified to were only those messages selected by [Detective] that he felt were important" and asserts that "the text messages were taken out of context and did not contain sufficient evidence to support a finding of authenticity or identification."

---

9. A statute is not narrowly tailored when it affects a class of persons greater than necessary to vindicate the identified compelling interest of the state. *See Ward v. Rock Against Racism*, 491 U.S. 781, 799–800 & n.7 (1989) (noting that "a complete ban on handbilling would be substantially broader than necessary to achieve the interests justifying it" and therefore would not be narrowly tailored). We note that Father has not identified any class of persons other than those intended by the Act that are affected by the presumption against reunification services.

¶57 Father and the State both treat the text messages as admitted evidence. Father contends that they were not properly authenticated under rule 901 of the Utah Rules of Evidence while the State responds that the parents' testimony constituted sufficient authentication. However, the text messages were not formally admitted into evidence. When they were discussed, Father objected to their use, but the juvenile court denied his objections on the ground that the text messages were not being admitted into evidence. Indeed, at one point in the proceedings, the juvenile court ruled that the text messages could not be admitted into evidence. Nevertheless, the juvenile court relied upon them and concluded in its findings that they contradicted the parents' other testimony in some respects. We conclude that it was improper for the juvenile court to rely on the text messages as evidence when they had not been received into evidence.

¶58 We next consider whether the improper use of the text messages was sufficiently prejudicial to undermine our confidence in the court's findings and conclusions of law. Rule 61 of the Utah Rules of Civil Procedure provides,

> No error in either the admission or the exclusion of evidence . . . is ground for granting a new trial or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

Utah R. Civ. P. 61. An error is harmless when it is "sufficiently inconsequential that we conclude there is no likelihood that the error affected the outcome of the proceedings." *Crookston v. Fire Ins. Exchange*, 817 P.2d 789, 796 (Utah 1991) (citation and internal quotation marks omitted).

¶59     The juvenile court relied on the text messages to conclude that Father "was frustrated while caring for his child." The court noted, "Both parents testified that this was not true, however, the text messages read to the court and the lies admitted to by [Father] make their testimony not credible." Thus, the effect of the text messages was to establish that Father was frustrated with Younger Child. This frustration was part of the circumstantial evidence showing that Father was responsible for Younger Child's injuries.

¶60     However, even discounting the frustration, there was extensive other evidence that Younger Child's injuries were caused by Father. For example, Younger Child was "awake and smiling" and "did not appear to have any problems" when Mother left the house but was severely injured when 911 was called in the afternoon. Father was the only caretaker present in the interim. As noted above, the core question in the abuse adjudication was not whether Father intentionally (versus knowingly or recklessly) abused Younger Child but rather whether Younger Child had suffered nonaccidental severe abuse at all while in Father's care. *See supra* ¶¶ 53–54. While Father's frustration could well have been probative as to the former point because it relates to Father's intent, such frustration is much less probative as to the latter question. Put another way, regardless of whether Father *intended* to abuse Younger Child, there was abundant other evidence suggesting that Younger Child did indeed suffer nonaccidental severe abuse while in Father's exclusive care.

¶61     Because Father's frustration was not central to the court's determination that Younger Child had suffered nonaccidental severe abuse, the improper "admission" of the text messages suggesting such frustration does not undermine our confidence in that determination.

CONCLUSION

¶62   For the foregoing reasons, the order of the juvenile court is affirmed.

———————