2019 UT App 34

# THE UTAH COURT OF APPEALS

IN THE INTEREST OF C.C.W. AND Z.C.W.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

R.D.T. AND GUARDIAN AD LITEM,
Appellants,
*v.*
C.L.W.,
Appellee.

Opinion
No. 20170360-CA
Filed March 7, 2019

Third District Juvenile Court, West Jordan Department
The Honorable Renee M. Jimenez
No. 1135445

Troy L. Booher, Julie J. Nelson, Erin B. Hull, and
Shane A. Marx, Attorneys for Appellant R.D.T.

Martha Pierce, Attorney for Appellant
Guardian ad Litem

David Pedrazas, Attorney for Appellee

JUDGES RYAN M. HARRIS and MICHELE M. CHRISTIANSEN FORSTER
jointly authored this Opinion. JUDGE GREGORY K. ORME
concurred in the result.

HARRIS and CHRISTIANSEN FORSTER, Judges:

¶1     R.D.T. (Mother) petitioned the juvenile court to terminate
the parental rights of her ex-husband, C.L.W. (Father), as to their
children, C.C.W. and Z.C.W. (collectively, the Children). After
Mother presented her case-in-chief, Father asked the court to
dismiss Mother's petition. The court granted the motion on the
ground that—although Father had abandoned the Children and

had twice been incarcerated for violently attacking Mother and, later, another woman—it was not in the Children's best interest to terminate Father's parental rights. Mother and the Guardian ad Litem (the GAL) appeal, contending that the court misapplied the law to the facts. In one significant respect, we agree, and therefore vacate the juvenile court's determination and remand for further proceedings consistent with this opinion.

## BACKGROUND

¶2     Mother and Father married in September 2005. Z.C.W. was born in August 2006 and C.C.W. in January 2009. Shortly after C.C.W. was born, and when Z.C.W. was three years old, Father brutally attacked Mother and threatened to kill her at gunpoint after the two had an argument about Father's infidelity. Father was charged with aggravated kidnapping and two counts of aggravated assault, and ultimately pled guilty to kidnapping and aggravated assault. The court presiding over his criminal case sentenced him to prison, where he was incarcerated from April 2010 to March 2013.

¶3     While Father was incarcerated, Mother filed for divorce, and a divorce decree was entered in 2010 that awarded Mother sole physical custody of the Children. Mother and Father have each remarried thereafter.

¶4     In 2014, one year after his release from prison, Father violated his parole by leaving the state, attacked another woman in Missouri, and later pled guilty to domestic assault. For this crime, he was incarcerated in Missouri from May 2014 to December 2016.

¶5     In October 2016, just before Father was released from prison for the second time, Mother petitioned the juvenile court to terminate Father's parental rights. Mother filed the petition because she believed, among other things, that Father had

abandoned the Children, and because she believed that reintroducing Father into the Children's lives would be disruptive and potentially violent. The case proceeded to trial.

¶6 After Mother presented her case-in-chief, but before he put on any evidence of his own, Father asked the court to dismiss Mother's petition. The juvenile court granted Father's motion and entered findings of fact and conclusions of law, wherein it found that Father had abandoned the Children but that Mother had not shown that it was in the Children's best interest to terminate Father's parental rights.

¶7 The juvenile court first found that there were grounds for termination because Father did not attempt to communicate at all with the Children beginning in 2012, during his first incarceration, and through 2016 when Mother filed her termination petition. Significantly, Father did not attempt to communicate with the Children during the year between his two terms of incarceration, even though an order of therapeutic reintroduction had been entered to reestablish Father's relationship with the Children. The court found that, rather than take advantage of this opportunity, Father left the state, violated his parole, and committed another assault. As a result of Father's neglect of his parental responsibilities, the court found that he destroyed the parent-child relationship. Accordingly, the court found that Father had abandoned the Children.

¶8 The court also found that Mother's testimony regarding Father's attack on her was credible. In the court's words, "Father's crimes were extremely violent, and they caused his victims, [Mother] in particular, unthinkable physical and emotional injuries."[1] Notwithstanding this determination, the

---

1. While the juvenile court's finding is accurate, it lacks detail and uses relative terms. Mother's testimony regarding the attack, credited by the juvenile court, bears fuller explication. The attack

(continued…)

court found that Father's history of violence toward women did not make him an unfit parent because those acts were against adults, not children. In particular, the juvenile court stated that, while Father's "crimes may have made him a terrible husband, . . . assaulting your spouse or another person[] does not necessarily mean that you are unable to fulfill your duties as a parent." The court found it significant that "[t]here is no evidence that [Father] is an inherently violent person or that he has been violent with his own or other children."

¶9    Having found that there were grounds for termination—namely, abandonment—the court began its best-interest analysis. The court found that under Mother's care, the Children were good students, excelled in extracurricular activities, and enjoyed "security and stability." Somewhat contradictorily, the court then stated that Mother "has not necessarily had consistently stable relationships in her own life which [h]as resulted in some instability or inconsistency in the [C]hildren's lives." The court added that the Children "have experienced a changing landscape of parental figures during their entire lives,

---

(…continued)

lasted over two hours, during which Father (1) grabbed Mother by the neck and threw her against a wall "from one place to the other," denting the sheetrock; (2) repeatedly choked Mother to the point that she could not breathe, causing her to gasp for air and briefly lose consciousness; (3) ordered her to the basement, where he interrogated her at gunpoint; (4) punched, slapped, and hit Mother in the face and head with a gun; (5) threatened to kill Mother with the gun; (6) smothered Mother's face in a pillow, causing Mother to gasp for air, and pressed the gun against the pillow and asked, "Now that you think you're going to die, are you finally going to tell me the truth?"; and (7) after leaving the house in a car with Mother to take formula and diapers to Mother's parents who were watching the Children, threatened to kill Mother if she left the car.

and two of these significant changes have nothing to do with [Father]." The court stressed that, at the time, there was no plan for Mother's current spouse to adopt the Children, and therefore "there is no other individual, step-parent or otherwise, available to take over that legal parental role." However, the court also found that Mother's spouse was "developing a parent relationship" with the Children.

¶10 The court found that the Children have not asked about Father and "have no information" about him. But the court expressed its view that "Father's circumstances are different now." Although Father suffers from post-traumatic stress and bipolar disorders, he "obtained treatment for his mental health needs while incarcerated and he currently receives therapy and medication management" through the federal government's Department of Veterans Affairs. Since being released from prison, Father has been "a coach and a mentor to other children." Father now resides with his second wife and two stepchildren. He has also maintained contact with his older daughter who is the Children's half-sister and whom the Children know. The court stressed that Father "does not have the ability to ever assume full custody of the [C]hildren," that he is willing to participate in reunification services, and that he "desires the opportunity to provide love, support and guidance to the [C]hildren." The court specifically found that, if the reunification process were "done properly, Father could be a positive person in the [C]hildren's lives . . . . There are adequate and protective measures built into the reunification process that take into consideration the [C]hildren's needs." The court concluded that "[t]here is insufficient evidence that [Father] exercising parent-time with the [C]hildren would cause significant harm or risk of harm to the [C]hildren's physical, mental or emotional well-being."

¶11 Also, during its best-interest determination, the court found it significant that the Children might be eligible to receive support payments from the federal government as a result of

Father's military service. While Father was incarcerated, Mother was able to apply for an apportionment of his benefits to be used as support for the Children. During Father's incarcerations, the Children obtained approximately $38,000 in support. The court found that these payments amounted to child support.

¶12    After considering all of its findings, the court concluded that there were no "compelling reasons to terminate [Father's] parental rights and that it [was] not strictly necessary to terminate [Father's] parental rights."

## ISSUE AND STANDARD OF REVIEW

¶13    Mother and the GAL contend that the juvenile court erred in granting Father's motion to dismiss, asserting that Mother presented clear and convincing evidence that Father's parental rights should be terminated. A court may grant such a motion "if (1) the claimant has failed to introduce sufficient evidence to establish a prima facie case, or (2) the trial court is not persuaded by that evidence." *In re J.A.*, 2018 UT App 29, ¶ 26, 424 P.3d 913 (quotation simplified).[2]

---

2. At the time he made his motion, Father cited rule 41(b) of the Utah Rules of Civil Procedure. A previous version of that rule stated that, "[i]n a bench trial, after the plaintiff 'has completed the presentation of [her] evidence, the defendant . . . may move for dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief.'" *See In re J.A.*, 2018 UT App 29, ¶ 26, 424 P.3d 913 (quoting the 2015 version of rule 41 of the Utah Rules of Civil Procedure). As we noted in *In re J.A.*, rule 41(b) was amended in 2016, and now speaks only of motions to dismiss for failure to prosecute. *Id.* ¶ 26 n.4; *see also* Utah R. Civ. P. 41(b). Under the current version of the rules, it is rule 52(e) of the Utah Rules of Civil Procedure that allows a party to move for

(continued…)

¶14 In this case, although the juvenile court determined that statutory grounds existed to terminate Father's parental rights, the court granted Father's motion on best-interest grounds, concluding that the evidence Mother presented in her case-in-chief did not provide "compelling reasons" to terminate Father's rights. Because termination decisions "rely heavily on the [trial] court's assessment and weighing of the facts in any given case," its decision "should be afforded a high degree of deference." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. For us "to overturn the [trial] court's decision the result must be against the clear weight of the evidence or leave [us] with a firm and definite conviction that a mistake has been made." *Id.* (quotation simplified).

## ANALYSIS

¶15 Mother and the GAL contend that the juvenile court misapplied the law to the facts. While expressing no opinion on the ultimate decision to be made in this case, we agree that the juvenile court's analysis was materially flawed and that remand is therefore required.

¶16 Under Utah law, before terminating a parent-child relationship, a court must find (1) that there are grounds for termination and (2) that terminating parental rights is in the child's best interest. Utah Code Ann. § 78A-6-506(3) (LexisNexis

---

(…continued)
dismissal at the close of the other side's evidence. *See* Utah R. Civ. P. 52(e); *see also id.* advisory committee note (stating that "the 2016 amendments move a provision found in Rule 41(b) to this rule"). In this case, the parties and the juvenile court appear to have been applying the 2015 version of the rules in making and adjudicating the motions at issue. But in any event, the standard of review is the same, regardless of whether the motion is grounded in rule 41(b) or rule 52(e).

2018). There is no dispute that the juvenile court properly found that, as a result of Father's abandonment of the Children, there were grounds for termination. The dispute solely concerns the court's best-interest analysis.

¶17    Mother first argues that it "is well settled" that where grounds for termination are established, it is "almost automatically" in the child's best interest to terminate parental rights. Because the juvenile court found that Father had abandoned the Children, she asserts that the court should have automatically concluded that it was in the Children's best interest to terminate Father's parental rights.

¶18    We have indeed previously stated that "where grounds for termination are established, the conclusion that termination will be in a child's best interest follows *almost automatically*." *In re G.J.C.*, 2016 UT App 147, ¶ 25, 379 P.3d 58 (emphasis added) (quotation simplified), *abrogated by In re B.T.B.*, 2018 UT App 157. But, as we recently concluded in *In re B.T.B.*, our "almost automatically" line of cases was not supported by statutory language or Utah Supreme Court case law, and we disavowed all of our cases that had relied upon the concept. 2018 UT App 157, ¶ 44 & n.12.[3] We noted that the "almost automatically" characterization had gone too far, and that the "'best interest' inquiry requires courts to examine all of the relevant facts and circumstances surrounding the child's situation, not just the specific statutory grounds for termination." *Id.* ¶ 55. We therefore determined that "the 'best interest' inquiry should be applied in a more thorough and independent manner than some

---

3. The briefing and argument in this case took place prior to the issuance of our opinion in *In re B.T.B.*, 2018 UT App 157. After that opinion issued, the GAL filed a motion (which Mother joined) for "emergency relief" asking us to stay proceedings in this case "pending resolution" of petitions for rehearing in *In re B.T.B.* We decline that invitation, and hereby deny the motion.

of our cases might suggest." *Id.* ¶ 2. We therefore reject Mother's contention that, after determining there were grounds for termination, the juvenile court should have automatically concluded that it was in the Children's best interests to terminate Father's parental rights.

¶19 It does not follow, however, that Mother's appeal is unsuccessful. In particular, we are troubled by the juvenile court's treatment of Father's history of domestic violence. Although it recognized that "Father's crimes were extremely violent, and they caused his victims, [Mother] in particular, unthinkable physical and emotional injuries," the juvenile court concluded that "assaulting your spouse or another person[] does not necessarily mean that you are unable to fulfill your duties as a parent," and that "when assessing the issue of unfitness to parent . . . the focus is on the parent's interactions with children" rather than on the parent's interactions with other adults.[4] While

---

4. In the context of assessing the severity of Father's violent acts toward Mother, the juvenile court also mentioned that, after Father assaulted Mother, Father "continued to reside in the family home with" Mother and the Children for another few weeks, and that even after their separation, Father and Mother "continued in a sexual and/or romantic relationship" for a while, and noted that "[a]t no time" during this period did Mother "prohibit [Father] from taking the [C]hildren" or "seek a child protective order prohibiting" Father from exercising parent-time. We caution trial courts to avoid unnecessarily drawing negative inferences from a battered spouse's decision to maintain a relationship with the batterer, or from a battered spouse's decision to decline to immediately seek help. In many instances, victims of domestic violence stay in abusive relationships, at least for a time, because they may not feel like they have any other option, or because they may feel they are at least partly to blame for the violence. *See* Mary Ann Dutton, *Understanding Women's Responses to Domestic Violence: A Redefinition of Battered*

(continued…)

it is true that a history of domestic violence does not necessarily lead to parental termination in every case, we nevertheless find the juvenile court's statements problematic, and emphasize that—even where there is no evidence of violence toward children—it is inappropriate to completely separate or compartmentalize a parent's history of domestic violence toward other adults from the best-interest inquiry regarding that parent's child.[5]

---

(…continued)
*Woman Syndrome*, 21 Hofstra L. Rev. 1191 (1993); Martha R. Mahoney, *Legal Images of Battered Women: Redefining the Issue of Separation*, 90 Mich. L. Rev. 1, 6 (1991).

5. We recognize that the juvenile court made these comments in the context of analyzing whether Father was "unfit" to parent the Children, which is one of the statutory grounds for termination, Utah Code Ann. § 78A-6-507(1)(c) (LexisNexis 2018), rather than in the context of analyzing whether termination of Father's parental rights would be in the Children's best interest. The juvenile court was incorrect in refusing to take Father's history of domestic violence into account when considering Father's fitness to parent the Children, because our legislature expressly requires courts to consider a parent's "history of violent behavior" against anyone—not just children—in assessing a parent's fitness. *See id.* § 78A-6-508(2)(f) (mandating that, "[i]n determining whether a parent . . . [is] unfit . . . the court shall consider . . . [the parent's] history of violent behavior"); *see also, e.g., In re A.C.M.*, 2009 UT 30, ¶ 27, 221 P.3d 185 (affirming a juvenile court's decision to take into account a parent's violence toward his "domestic partner[s]," even though there was no evidence of violence toward children); *In re K.C.*, 2014 UT App 8, ¶ 4, 318 P.3d 1195 (per curiam) (affirming a juvenile court's decision to take into account a parent's commission of "domestic violence in the

(continued…)

¶20    Such compartmentalization conflicts with the statutory view that a history of violent behavior has relevance, especially when committed against "the other parent of the child." *See* Utah Code Ann. § 78A-6-316(2)(iv); *cf. id.* § 76-5-109.1 (criminalizing actions of domestic violence committed "in the presence of a child," even if the child is not the direct victim). And both common sense and expert opinion indicate that a parent's acts of domestic violence can have adverse impacts on a child, even if that child is not the direct object of such violence, and even if the child does not directly witness the violence. *See Winston J. v. State Dep't of Health & Social Services, Office of Children's Services*, 134 P.3d 343, 348 (Alaska 2006) (concluding that a father's acts of domestic violence against his children's mother, coupled with his history of violence against other women, created a substantial risk of harm even though the children had not yet been born when the acts occurred); *In re V.V.*, 349 S.W.3d 548, 555 (Tex. Ct. App. 2010) (en banc) (concluding that a parent's history of domestic violence, even if not directed at his child, provided support for the trial court's termination decision because this conduct placed his child in jeopardy); Marjory D. Fields, *The Impact of Spouse Abuse on Children and Its Relevance in Custody and Visitation Decisions in New York State*, 3 Cornell J.L. & Pub. Pol'y 221, 228 (1994) ("Studies show that violence by one parent against another harms children even if they do not

---

(…continued)

presence of the children," even though no mention was made of violence toward the children themselves). But in addition, for the reasons we explain herein, a parent's history of domestic violence, even against other adults, is a factor that the court should consider as part of the "best interest" analysis, even if that history might also be relevant to one or more of the statutory grounds for termination. *Cf., e.g., In re B.T.B.*, 2018 UT App 157, ¶ 55 (stating that "[t]he 'best interest' inquiry requires courts to examine all of the relevant facts and circumstances surrounding the child's situation").

witness it."). Indeed, numerous studies clearly show that violence directed at a parent—even where not directed at the children—can have a significant impact on the abused parent's children, especially when the abused parent is the children's primary caretaker. *See* Michal Gilad, Abraham Gutman & Stephen P. Chawaga, *The Snowball Effect of Crime and Violence: Measuring the Triple-C Impact*, 46 Fordham Urb. L.J. 1, 4, 9–10 (2019); Karen Czapanskiy, *Domestic Violence, The Family, and the Lawyering Process: Lessons from Studies on Gender Bias in the Courts*, 27 Fam. L.Q. 247 (1993); *see also* Naomi R. Cahn, *Civil Images of Battered Women: The Impact of Domestic Violence on Child Custody Decisions*, 44 Vand. L. Rev. 1041, 1055–56 (1991) (stating that, "even if they are not physically harmed, children suffer enormously from simply witnessing the violence between their parents," and that "children of abusive fathers are likely to be physically abused themselves"). These notions are not new; more than three decades ago, health professionals were making efforts to tell judges about the potential impact a parent's domestic violence could have on children, emphasizing that children who are exposed to abuse may be taught that violence is an acceptable way to handle issues with loved ones:

> Children learn several lessons in witnessing the abuse of one of their parents. First, they learn that such behavior appears to be approved by their most important role models and that the violence toward a loved one is acceptable. Children also fail to grasp the full range of negative consequences for the violent behavior and observe, instead, the short term reinforcements, namely compliance by the victim. Thus, they learn the use of coercive power and violence as a way to influence loved ones without being exposed to other more constructive alternatives.
>
> . . . .

> Spouse abuse results not only in direct physical and psychological injuries to the children, but, of greatest long-term importance, it breeds a culture of violence in future generations. Up to 80 percent of men who abuse their wives witnessed or experienced abuse in their family of origin. Abused children are at great risk of becoming abusive parents.

*Patricia Ann S. v. James Daniel S.*, 435 S.E.2d 6, 18 (W. Va. 1993) (Workman, C.J., dissenting) (quoting L. Crites & D. Coker, *What Therapists See That Judges May Miss,* The Judges' Journal, 9, 11–12, (Spring 1988)).[6]

¶21 When a parent whose parental rights are subject to being terminated has a history of violence, particularly domestic

---

6. Relevant literature indicates that men who saw their mothers abused are more than twice as likely to abuse their spouses as adults, and that women who saw their mothers abused are twice as likely to be victimized as adults. *See* Matthew Robins, *State of Fear: Domestic Violence in South Carolina*, 68 S.C. L. Rev. 629, 661 (2017) (citing Charles L. Whitfield et al., *Violent Childhood Experiences and the Risk of Intimate Partner Violence in Adults*, 18 J. Interpersonal Violence 166, 178 (2003)); *see also* Michal Gilad, Abraham Gutman & Stephen P. Chawaga, *The Snowball Effect of Crime and Violence: Measuring the Triple-C Impact*, 46 Fordham Urb. L.J. 1, 10 (2019) ("The rattling presence of violence in the home can also lead to erroneous beliefs: the conceptualization that aggression is a functional and legitimate part of intimate relationships and family dynamics, and the belief that men are intrinsically dominant and privileged.") (*citing* Sandra A. Graham-Bermann & Victoria Brescoll, *Gender, Power and Violence: Assessing the Family Stereotypes of the Children of Batterers*, 14 J. Fam. Psychol. 600, 605 (2000)).

violence, trial courts should carefully weigh the potential impact of that violence on the children as part of considering whether termination of the parent's rights would be in the best interest of the children, even if the parent has not visited any of that violence directly upon the children. *See In re B.T.B.*, 2018 UT App 157, ¶ 47 (stating that "the 'best interest' inquiry is broad, and is intended as a holistic examination of all of the relevant circumstances that might affect a child's situation"); *see also In re K.K.*, 2017 UT App 58, ¶ 4, 397 P.3d 745 (per curiam) (explaining that Mother's "unresolved domestic violence issues" made it "unsafe for the children to be around her"); *In re R.T.*, 2013 UT App 108, ¶ 7, 300 P.3d 767 (per curiam) (concluding that it was in the children's best interest to terminate their father's parental rights given his history of violence and anger issues).

¶22    In this case, Father not only attacked two women, but he brutally beat Mother, choked her to the point of momentary unconsciousness, and threatened to kill her at gunpoint. Yet in its findings, the juvenile court brushed aside Father's violent history and the risk that Father's conduct might pose to the Children, emphasizing the fact that there was no evidence that Father had ever been violent toward children. We find such compartmentalization troubling, especially given the fact that individuals prone to domestic violence tend to reoffend.[7] *See United States v. Bryant*, 136 S. Ct. 1954, 1959 (2016) ("As this Court has noted, domestic abusers exhibit high rates of recidivism, and their violence 'often escalates in severity over time.'") (quoting *United States v. Castleman*, 572 U.S. 157, 160 (2014)); *see also* Linell A. Letendre, *Beating Again and Again and Again: Why Washington Needs a New Rule of Evidence Admitting Prior Acts of Domestic Violence*, 75 Wash. L. Rev. 973, 977–78 (2000) (stating that a person's past violent behavior is "the best predictor of future violence," because "studies demonstrate that

---

7. In this case, as noted above, Father did reoffend, and did so within one year of his release from prison on his first offense.

once violence occurs in a relationship, the use of force will reoccur in 63% of these relationships," and that "even if a batterer moves on to another relationship, he will continue to use physical force as a means of controlling his new partner" (quotation simplified)).

¶23    Of course, not every parent who has committed an act of domestic violence deserves to have his or her parental rights terminated. Each case must be judged on its own merits, and in appropriate cases a trial court might reasonably find, among other things, that the domestic violence issues in the case are not sufficient to counsel in favor of termination; that the parent in question has taken meaningful steps to change his or her life and make amends; that under the circumstances presented there is no significant risk of continued violence; or that, even when all incidents of past violence are fully considered, the children would be better off with the parent still playing an active role in their lives than they would be if the parent's rights were terminated. But the trial court must carefully explain its reasons for so finding, and it is not sufficient to say, as the juvenile court essentially did here, that acts of domestic violence are not relevant in a termination case simply because none of the violence was directly visited upon the Children.

¶24    Again, we recognize that the juvenile court made these comments in the context of assessing Father's fitness as a parent under statutory grounds. While the juvenile court did not repeat these comments in the "best interest" portion of its analysis, and while the juvenile court did make general findings that Father's "circumstances are different now" because, among other things, Father has "obtained treatment for his mental health needs" and "currently receives therapy," the juvenile court never directly grappled with Father's violent history in its best interest analysis. It may be that the juvenile court espouses the view that, in this case, the steps Father has taken to address his situation have ameliorated any risk that his violent past might pose to his successful reintroduction into the Children's lives. But the

juvenile court did not expressly explain why it believes this is so and, evaluated against the backdrop of the compartmentalizing comments it made in the course of its "fitness" analysis, we cannot construe the juvenile court's best-interest discussion as containing adequately articulated reasons for its decision.[8]

---

8. Mother raises two other potential flaws with the juvenile court's analysis. First, she asserts that the juvenile court focused too heavily on *Mother's* fitness as a parent, in violation of our earlier pronouncement that "the best interests prong of the termination statute does not anticipate an evaluation of a parent whose fitness has not been challenged by a cross-petition to terminate parental rights." *See In re A.M.*, 2009 UT App 118, ¶ 23, 208 P.3d 1058. At issue in that case was an effort by the parent whose rights were at issue to subpoena the other parent's "health records" in an effort to prove *her* unfitness. *Id.* ¶¶ 18, 21. We affirmed the juvenile court's order quashing that subpoena, on the grounds that those health records were irrelevant because the other parent's fitness was not at issue. *Id.* ¶ 23. That case is easily distinguishable from this one, in that here, the juvenile court's discussion of Mother's living situation came in the context of assessing whether the Children were "stable," and in evaluating Mother's own argument that adding Father back into their lives would affect their stability. Taking such things into account as part of the holistic "best interest" inquiry is entirely proper, and a far cry from, for instance, giving the respondent in a termination case access to the petitioner's health records.

Second, Mother asserts that the juvenile court relied too heavily on the possibility that termination of Father's parental rights might result in the Children losing any right to receive any of Father's veterans' benefits. This issue was not well briefed by the parties from a legal standpoint, and its resolution also depends upon factual issues not specifically found by the juvenile court, which phrased its findings on this issue in hypothetical, conditional terms (e.g., the Children "would

(continued…)

CONCLUSION

¶25    Accordingly, we conclude that the juvenile court's best-interest determination was materially flawed, because the court did not appropriately consider what effect, if any, Father's history of domestic violence might have on his efforts to re-establish a relationship with the Children. We therefore vacate the juvenile court's order dismissing Mother's petition, and remand for proceedings consistent with this opinion. We do not, however, make any effort to urge the juvenile court to reach one conclusion or another upon reconsideration. Given the juvenile court's superior position and specialized training and experience in matters involving children, supported factual findings from the juvenile court on remand, entered after adequately considering all of the proper factors, are, of course, always entitled to deference by appellate courts.

———————

(…continued)
potentially" lose veterans' benefits because Father "could object" to their receiving them). To the extent this issue remains relevant on remand, the juvenile court may invite the parties to explore it in a more meaningful way.