2019 UT App 98

## THE UTAH COURT OF APPEALS

STATE OF UTAH, IN THE INTEREST OF C.S., C.S., AND C.S.,
PERSONS UNDER EIGHTEEN YEARS OF AGE.

M.C.W.,
Appellant,
*v.*
STATE OF UTAH,
Appellee.

Opinion
No. 20170732-CA
Filed June 6, 2019

Fifth District Juvenile Court, St. George Department
The Honorable Michael F. Leavitt
No. 542094

J. Robert Latham, Attorney for Appellant

Sean D. Reyes, Carol L.C. Verdoia, and John M.
Peterson, Attorneys for Appellee

Martha Pierce, Guardian ad Litem

JUDGE MICHELE M. CHRISTIANSEN FORSTER authored this Opinion,
in which JUDGES KATE APPLEBY and DIANA HAGEN concurred.

CHRISTIANSEN FORSTER, Judge:

¶1     In August 2017, the juvenile court granted permanent guardianship of C.S., C.S., and C.S. (collectively, Children) to their paternal grandmother (Grandmother). M.C.W., Children's mother (Mother), filed a post-judgment motion challenging the court's permanency order. Mother argued (1) that the court should order additional investigation into the safety, fitness, and appropriateness of Grandmother's permanent home in another state and the relatives residing there; (2) that the evidence

presented at the permanency hearing was insufficient to support Children's permanent placement with Grandmother; and (3) that the court should grant a new trial or alter or amend its findings of fact and conclusions of law to reflect evidence presented at trial that was not included in the court's permanency order. The juvenile court denied the motion, and Mother appeals. We affirm.

BACKGROUND

¶2     Mother has appeared before the juvenile court twice for dependency proceedings initiated by the Utah Division of Child and Family Services (DCFS). In 2008, a juvenile court determined that Children were abused and neglected and removed them from Mother's custody. The basis for the removal was Mother's substance abuse, a drug overdose, and incidents of domestic violence. After Mother's successful completion of reunification services, the juvenile court returned Children to her custody in 2009 and terminated further protective supervision services.

¶3     The second dependency proceeding followed Mother's arrest on July 19, 2016. Mother and Children were residing at a shelter for victims of domestic violence when police responded to a complaint that Children were assaulting staff members and damaging the facility. When they arrived at the shelter, police learned that Mother had an outstanding warrant. She was arrested, and Children were placed in the protective custody of DCFS. The juvenile court then determined that Mother abused and neglected Children.

¶4     At the first shelter hearing in July 2016, the juvenile court found that removal of Children from Mother's custody was necessary and in their best interests. The court determined that Children could be safely returned to Mother's custody only if DCFS provided protective supervision. The court appointed a

guardian ad litem for Children and ordered DCFS to prepare a service plan for Mother. The service plan required Mother to provide meals, maintain safe and legal housing for Children, and undertake parent training. The court also ordered Mother to refrain from using drugs and alcohol, to submit to drug tests, and not to associate with anyone under the influence of alcohol.

¶5     At a second shelter hearing in August 2016, Mother conceded that she could not keep Children safe from each other and could not prevent their destructive behavior. Mother therefore voluntarily agreed to return Children to DCFS custody. Children were placed in the temporary custody of DCFS, and the juvenile court ordered DCFS to consider Grandmother, who lived in Arkansas but who was willing to relocate to Utah to care for Children, as a potential placement option for Children. The court was aware that Grandmother had assumed periodic custody of Children over the years when Mother and Children's father had been unable to provide for them.[1]

¶6     Thereafter, Mother requested that the juvenile court return Children to her custody. During a pretrial hearing in September 2016, the juvenile court postponed ruling on Mother's request and allowed the State and the guardian ad litem to continue to look into other possible placements for Children. The court allowed DCFS to make a provisional placement with Grandmother, who at this point had moved from Arkansas to Utah, once she successfully completed a background check. The court also ordered DCFS to provide reunification services to Mother for twelve months.

---

1. Children's father failed to respond to the State's petition and the court entered a default judgment against him. L.S. has an extensive history of substance abuse, domestic violence, and involvement with the criminal justice system.

¶7     At the subsequent adjudication/disposition hearing, the court ordered Mother to undergo a psychological evaluation, parenting training, and family therapy; to obtain stable housing and a legal means of income; and to participate in an assessment to determine the family's needs. Mother made little progress in following this plan however. Her participation in individual therapy was a precondition for starting family therapy, but she did not think she needed therapy and did not attend any sessions for approximately five months after being notified of this requirement. The month she began attending therapy, Mother lost her job and housing, and she stopped attending family therapy. She had continued difficulties in visits with Children, and she often argued with Grandmother, the DCFS caseworker, and Children during those visits. Mother also had trouble following through with appropriate parenting skills during her parent-time and often blamed Children for the problems. During the reunification period, Mother did not maintain consistent employment or obtain stable housing. In contrast, after Children were placed with Grandmother, she consistently cared and provided for them. Grandmother relocated from Arkansas to Utah to care for Children, obtained an apartment and employment, and engaged in behavior-related training and therapy to learn how to better control Children's problematic behaviors. Grandmother provided consistent discipline and ensured that Children attended school, therapy, and parent-time with Mother.

¶8     Mother's permanency hearing began in July 2017 and lasted five days. Throughout the proceedings, the juvenile court recognized that it was in Children's best interests to be placed in a guardianship with a relative if they could not be returned safely to Mother's custody at the end of the reunification period. To that end, Grandmother had informed the court that she was "willing to have [Children] placed with her if [it was] deemed appropriate." Because Grandmother was a permanent resident

of Arkansas, she testified at the permanency hearing to the conditions she would provide for Children in Arkansas. Grandmother owned her own business and lived with her husband (Step-grandfather), Children's aunt (Aunt), and Aunt's two young children. Grandmother had been married to Step-grandfather for fifteen years, and he had attended classes for foster parents. They had purchased a five-bedroom house in May 2016, which was being remodeled. Grandmother informed the court about the school Children would attend, her plans to take them to school, and her intention to continue to facilitate their participation in therapy. Grandmother testified that Step-grandfather was once a drug user but that he had been drug-free for over forty years. Neither Grandmother nor Step-grandfather currently used any alcohol or controlled substances. Grandmother acknowledged that Step-grandfather once had Hepatitis C and cirrhosis, and had received a liver transplant; she also acknowledged that Step-grandfather was convicted of robbery forty-five years ago. Grandmother indicated that the records from these incidents have been sealed and that Step-grandfather eventually received a pardon from Arkansas's governor.

¶9    Based on the evidence presented at the permanency hearing and Mother's failure to comply with the service plan, the juvenile court found by a preponderance of the evidence that returning Children to Mother "would create a substantial risk of detriment to their emotional well-being." The court found that guardianship with a relative was the most appropriate plan for Children and thus awarded Grandmother permanent custody and guardianship, and it terminated reunification services for Mother. The findings of fact in the court's permanency order do not include information about Step-grandfather, Aunt, or Grandmother's household in Arkansas.

¶10    After the permanency order was entered, Mother filed a post-judgment motion for a new trial or to amend the court's

findings of fact and conclusions of law. The juvenile court denied the motion, and Mother appeals.

ISSUES AND STANDARDS OF REVIEW

¶11   Mother appeals the juvenile court's permanency decision on several grounds. First, she contends that the court erred in denying her post-judgment request for additional investigation into Grandmother's living situation in Arkansas. This challenge requires us to determine whether the mandatory fitness and safety provisions contained in Utah Code section 78A-6-307, applicable at the initial stages of a child welfare proceeding, also apply to a juvenile court's permanent placement decisions. This is a question of statutory interpretation, which we review for correctness, giving no deference to the juvenile court's interpretation. *In re B.N.A.*, 2018 UT App 224, ¶ 8, 438 P.3d 10.

¶12   Second, Mother contends that the juvenile court's findings of fact are insufficient to support its decision to award Grandmother permanent guardianship of Children. "We afford great deference to the juvenile court's findings of fact," *In re A.C.M.*, 2009 UT 30, ¶ 8, 221 P.3d 185, and will overturn the court's decision only "if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence," *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. Further, we give the juvenile court "a wide latitude of discretion as to the judgments arrived at based upon not only the court's opportunity to judge credibility firsthand, but also based on the juvenile court judges' special training, experience and interest in this field." *In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680 (quotation simplified).

¶13   Third, Mother contends that the juvenile court improperly denied her post-judgment request for a new trial or to alter or amend the judgment, arguing that the court's permanency

decision was not supported by sufficient evidence. We review motions for a new trial and motions to amend a judgment for an abuse of discretion. *In re A.F.K.*, 2009 UT App 198, ¶ 17, 216 P.3d 980. "The [juvenile] court's denial of a motion for a new trial will be reversed only if the evidence to support the [judgment] was completely lacking or was so slight and unconvincing as to make the [judgment] plainly unreasonable and unjust." *See Jessop v. Hardman*, 2014 UT App 28, ¶ 10, 319 P.3d 790 (quotation simplified). Mother also contends that the factual findings set forth in the court's permanency order were inadequate to justify the court's legal conclusions. "We review the legal adequacy of findings of fact for correctness as a question of law." *Shuman v. Shuman*, 2017 UT App 192, ¶ 2, 406 P.3d 258 (quotation simplified).

ANALYSIS

I. Fitness and Safety

¶14    Mother contends that the mandatory fitness and safety provisions of section 78A-6-307 of the Utah Code applicable to a juvenile court's initial and temporary placement decisions made at a shelter hearing also apply to the court's permanent placement decisions. Specifically, she argues that a harmonious reading of the statutes governing child welfare proceedings mandates that the fitness, safety, and appropriateness requirements contained in section 78A-6-307 apply throughout all phases of child welfare proceedings. When interpreting statutes, our primary objective "is to give effect to the intent of the legislature." *In re J.M.S.*, 2011 UT 75, ¶ 13, 280 P.3d 410. First, we look at "the statute's plain language and presume that the legislature used each word advisedly and read each term according to its ordinary and accepted meaning." *Id.* (quotation simplified). Because statutory language is often not "plain" when read in isolation, we must read it "in light of its linguistic,

structural, and statutory context." *Id.* (quotation simplified). "For this reason, our interpretation of a statute requires that each part or section be construed in connection with every other part or section so as to produce a harmonious whole." *Id.* (quotation simplified). "If the language of the statute yields a plain meaning that does not lead to an absurd result, the analysis ends." *Murray v. Utah Labor Comm'n*, 2013 UT 38, ¶ 16, 308 P.3d 461 (quotation simplified).

¶15    If DCFS removes a child from a parent's custody because of abuse or neglect, a juvenile court must determine whether the removal was reasonable and whether continued removal is necessary. *See* Utah Code Ann. § 78A-6-306 (LexisNexis Supp. 2018). If the court finds continued removal necessary but the child is not returned to the custody of the child's other parent, then section 78A-6-307(7) governs. Pursuant to that section, the juvenile court must first determine whether "there is a relative or a friend who is able and willing to care for the child." *Id.* § 78A-6-307(7)(a). "If a willing relative or friend is identified under Subsection (7)(a), the court shall make a specific finding regarding" the fitness, safety, and appropriateness of the placement. *Id.* § 78A-6-307(10)(a). If the court makes "the finding described in Subsection (10)(a)" and the child will be placed with a relative, "the court shall, at a minimum, order" background investigations that include background checks of the relative and each non-relative who resides where the child will be placed. *Id.* § 78A-6-307(11). The statute also requires DCFS to visit the relative's home. *Id.* All of these requirements relate back to subsection 78A-6-307(7), which explicitly states that it applies "at the time of the shelter hearing." *Id.* § 78A-6-307(7).

¶16    These statutory requirements apply early on in a child welfare proceeding when the juvenile court must quickly determine who will have custody of the child until the child is able to be safely returned to the custody of his or her parent, if possible. At this stage, the court is not yet entirely familiar with

all the circumstances of the case and has limited information about the parties. Therefore, pursuant to the plain language of the statute, to facilitate placement of a child with a friend or relative, the requirements in section 78A-6-307(11) are mandatory only in connection with the initial placement of the child with a willing relative or friend. *Id.* § 78A-6-307(11)(a).

¶17 If the juvenile court determines that continued removal of a child is necessary, it then must establish a permanency plan and determine whether reunification services are appropriate for the child and the child's family. *Id.* § 78A-6-312(2). "In all cases, the minor's health, safety, and welfare shall be the court's paramount concern in determining whether reasonable efforts to reunify should be made." *Id.* § 78A-6-312(5). If reunification services are appropriate, the court will establish a service plan that outlines certain requirements the parent must meet over a designated period to regain custody of the child.

¶18 When reunification services are ordered, they are generally not to be provided for more than twelve months. *Id.* § 78A-6-312(13). Once the period for reunification services has expired, the court must hold a permanency hearing to evaluate the placement goal and make a determination if it is still appropriate. *See id.* § 78A-6-312(16). The purpose of the permanency hearing is to determine whether the child can be safely returned to the child's parent. *Id.* § 78A-6-314(2). If a parent fails to follow the service plan—that is, fails to remedy the problems that warranted the State's intervention in the first instance—the court must decide whether to continue reunification services or make a final determination regarding parental rights, custody, and guardianship. *Id.* § 78A-6-314(4). At this phase of the proceedings, if the court determines that a child may not be returned safely to his or her parent, the statute requires only that "the minor's health, safety, and welfare" "be the court's paramount concern." *Id.* § 78A-6-312(5).

¶19　In this case, Mother argues that the juvenile court was required to follow the procedures outlined in section 78A-6-307 when appointing Grandmother as Children's permanent guardian. Specifically, Mother argues that pursuant to subsection 78A-6-307(11), before Grandmother could be awarded permanent guardianship of Children, the court was required, at a minimum, to order a background check on Step-grandfather and the other individuals residing at Grandmother's house in Arkansas and to order DCFS to visit the Arkansas household. Mother contends that section 78A-6-307(11)'s requirements apply throughout the pendency of a child welfare proceeding. We disagree. A plain language reading of section 78A-6-307 demonstrates that the requirement for background investigations applies only to the determination of whether a child's placement is appropriate at the commencement of the reunification period. Section 78A-6-307 sets forth the required procedures for shelter hearings and the initial placement of a child who has been removed from parental custody. Subsection (11) states that the requirements concerning background checks apply to "making the finding described in Subsection (10)(a)." *Id.* § 78A-6-307(11). Subsection (10)(a) sets forth the findings the court must make if a "willing relative or friend" has been identified for temporary placement until a permanent determination is reached. *Id.* § 78A-6-307(10)(a).

¶20　When Grandmother first moved to Utah, she completed and passed the required background check. She obtained housing, and DCFS inspected Grandmother's Utah residence. Meanwhile, Step-grandfather remained in Arkansas. At that time, even before the initial placement, Grandmother was living by herself in Utah, so there was no statutory requirement for a background check on Step-grandfather in Arkansas.

¶21　One year later at the permanency hearing, when the juvenile court determined that Children could not be returned safely to Mother's custody, the court's only statutory directive in

figuring out a permanent placement for Children was that the court make its determination based on the "paramount concern" of Children's health, safety, and welfare. *Id.* § 78A-6-312(5). At the time of the hearing, Grandmother was still living alone in Utah, but even if she had been living with Step-grandfather in Utah or in Arkansas, a background check and a home inspection were not statutorily mandated at the permanency stage of the proceeding. Such investigation would be required at the permanency hearing only if the court found that ordering it was in the best interests of Children. "Once a court has determined that a child has been abused or neglected, that court is given broad discretion in determining the child's permanent placement." *In re L.M.*, 2001 UT App 314, ¶ 19, 37 P.3d 1188. Such is the case here. Accordingly, we affirm the juvenile court's decision denying Mother's request for further investigation.[2]

## II. Sufficiency of the Evidence

¶22 Mother next contends that (1) the juvenile court's findings of fact were insufficient to support its conclusion in the permanency order that Grandmother was an appropriate permanent guardian for Children, and (2) the overall evidence presented at the permanency hearing was not sufficient to support Grandmother as an appropriate person with whom to place Children. We address each argument in turn.

---

2. Mother raises some valid concerns as to a potential need for ongoing background checks and home inspections at every stage of a child welfare proceeding, especially if the award of permanent custody includes moving children out of state. But a plain reading of subsections 78A-6-307(10)–(15) demonstrates that the requirements of these subsections do not extend beyond the shelter-hearing stage of a child welfare case. A resolution in Mother's favor on this issue would require a statutory change.

A. Findings of Fact

¶23 A juvenile court's findings of fact will not be overturned unless they are against the clear weight of the evidence. *In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680. "To successfully challenge [a] juvenile court's findings of fact," Mother must "marshal all the evidence supporting the [juvenile] court's findings and then show the evidence to be legally insufficient to support the findings." *See In re J.M.V.*, 958 P.2d 943, 947 (Utah Ct. App. 1998) (quotation simplified). This requires Mother to do more than "present[] only those facts favorable to her argument." *See In re K.J.*, 2013 UT App 237, ¶ 38, 327 P.3d 1203. Instead, Mother must identify flaws in the evidence, and the findings resulting from it, rendering the juvenile court's reliance on it clearly erroneous. *See In re L.M.*, 2013 UT App 191, ¶ 17, 308 P.3d 553. "Where a party fails to marshal the evidence in support of a challenged finding, the party will almost certainly fail to carry its burden of persuasion on appeal." *In re A.J.*, 2017 UT App 235, ¶ 34 n.8, 414 P.3d 541 (quotation simplified).

¶24 Here, Mother does not address the factual findings the juvenile court relied on to support its conclusion that Grandmother was an appropriate permanent guardian for Children. Mother does not challenge the evidentiary basis of any of the court's specific findings, nor does she engage in any analysis suggesting that the court's findings did not support its conclusions. Instead, Mother focuses on the lack of certain evidence she claims might have shown that awarding permanent guardianship to Grandmother was not in Children's best interests. Mother cannot carry her burden by merely highlighting potentially problematic issues with Step-grandfather and the lack of additional testimony about Aunt and the household in Arkansas. Rather, she "must identify flaws in the evidence relied on by the [juvenile] court that rendered the [juvenile] court's reliance on it, and the findings resulting from it, clearly erroneous." *See Shuman v. Shuman*, 2017 UT App 192,

¶ 8, 406 P.3d 258 (quotation simplified). Mother has not done so, and as a result, she has not carried her burden to show that the court's factual findings were inadequate to support the conclusion that permanent placement with Grandmother was appropriate.

B.     Evidence for the Placement

¶25     "The Utah Code provides that if the juvenile court orders reunification services for a parent, a permanency hearing shall be held at the expiration of those services . . . ." *In re J.H.*, 2006 UT App 205, ¶ 7, 138 P.3d 70; *see also* Utah Code Ann. § 78A-6-312(16) (LexisNexis Supp. 2018). At the permanency hearing a juvenile court has two options: either (1) order that the child be returned to his or her parent, or (2) terminate reunification services and develop a permanency plan for the child if the court "finds that returning the child to the parent poses a substantial risk to the child's well-being." *In re S.K.*, 1999 UT App 261, ¶ 12 n.5, 987 P.2d 616 (quotation simplified). On appeal, Mother does not contest the court's finding that returning Children to her custody would pose a substantial risk to Children's well-being. Instead, she argues only that the court abused its discretion by granting Grandmother permanent guardianship, because the evidence presented at trial was insufficient to support that determination.

¶26     "Once a court has determined that a child has been abused or neglected, that court is given broad discretion in determining the child's permanent placement." *In re L.M.*, 2001 UT App 314, ¶ 19, 37 P.3d 1188. Custody determinations will be upheld if the determinations are "consistent with the standards set by appellate courts and supported by adequate findings of fact and conclusions of law." *In re J.M.V.*, 958 P.2d at 947 (quotation simplified). "When a foundation for the court's decision exists in the evidence, an appellate court may not

engage in a reweighing of the evidence." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435.

¶27　Here, Mother contends that the evidence presented at the permanency hearing was not sufficient for the juvenile court to establish that Grandmother was an appropriate permanent placement; specifically, she argues that Grandmother's testimony alone did not establish proof by a preponderance of the evidence that guardianship with Grandmother was in Children's best interests. Mother contends that further investigation into the Arkansas household and the individuals who reside there might reveal significant problems with that living situation. We are not persuaded.

¶28　When Children were removed from Mother's care, Grandmother left behind her husband in Arkansas, relocated to Utah, rented an apartment, and obtained employment so that she could care for Children. To support Mother's reunification efforts, Grandmother ensured that Children had transportation to school, parent-time, and therapy. She always made Children available for Mother's parent-time and never missed any therapy appointments. Grandmother also received significant training related to Children's behaviors. The court determined, based on the testimony and evidence presented at the permanency hearing, that Grandmother was able to help Children calm down and manage their conduct, offered consistent discipline, and created appropriate expectations for them. The juvenile court found that Children's behaviors improved significantly while in Grandmother's care. Children also indicated that it was their desire to be placed with Grandmother.[3]

---

3. A child's desire as to whom he or she wishes to live with may be considered by the juvenile court but is not controlling. While there "is no definitive checklist of factors to be used for

(continued…)

¶29 At the permanency hearing, the juvenile court determined that Children could not be returned safely to Mother. Consistent with the original concurrent goal for Children established at the adjudication/disposition hearing, the court found that placing Children with Grandmother was appropriate. We are not persuaded by Mother's argument that Grandmother's testimony alone is insufficient to establish that she and the individuals who reside in her Arkansas household will provide an appropriate living situation for Children. The judge in this case not only heard Grandmother's testimony at the permanency hearing, which provided the court with an opportunity for "a thoughtful, experience-based evaluation" of Grandmother, *see In re Z.D.*, 2006 UT 54, ¶ 49, 147 P.3d 401, but had also worked with Grandmother for more than a year, giving the court an extended "opportunity to judge [Grandmother's] credibility firsthand," *see In re E.R.*, 2001 UT App 66, ¶ 11, 21 P.3d 680. The judge's determination has added credibility based on his "special training, experience and interest in this field." *See id.* (quotation simplified). The court's findings were supported by evidence in the record. Therefore, we are not convinced that the court went against the clear weight of the evidence in finding that Grandmother is an appropriate permanent guardian.

---

(…continued)

determining custody since such factors are highly personal and individual," a juvenile court may consider "the preference of the child" as one of several factors, but it is not binding on the court. *In re J.M.*, 940 P.2d 527, 535 (Utah Ct. App. 1997) (quotation simplified). Best interest determinations often turn on many factors that the juvenile court "is best suited to assess, given its proximity to the parties and the circumstances." *Id.* (quotation simplified). Therefore, we will affirm a juvenile court's custody award so long as the court has not abused its discretion. *Id.*

¶30    Mother is correct that the court could have ordered more investigation that might have uncovered something that would render placement with Grandmother less appropriate. But Mother does not indicate what potentially troubling information about Step-grandfather and Aunt may be exposed by further investigation or argue that the court did not take into account the negative information about Step-grandfather's distant past to which Grandmother testified. Mother provides no evidence to support her speculative arguments and, because of this, fails to persuade us that the juvenile court did not consider Grandmother's housing situation in Arkansas or Step-grandfather's and Aunt's histories; those issues were discussed at the permanency hearing and the court considered them.

¶31    We will overturn a juvenile court's decision "only if it either failed to consider all of the facts or considered all of the facts and its decision was nonetheless against the clear weight of the evidence." *In re B.R.*, 2007 UT 82, ¶ 12, 171 P.3d 435. Because we determine that the court's decision to grant permanent custody and guardianship of Children to Grandmother was supported by sufficient evidence, we will not disturb it. *See In re C.C.W.*, 2019 UT App 34, ¶ 25.

III. Motion for New Trial and to Amend the Judgment

¶32    Finally, Mother contends that the juvenile court improperly denied her post-judgment motion for a new trial and to amend the juvenile court's permanency order to include additional findings. After the entry of judgment, rule 52 of the Utah Rules of Civil Procedure permits a party to request that the court "amend its findings or make additional findings and . . . amend the judgment accordingly." Utah R. Civ. P. 52(b). Presuming that the additional or amended findings undermine the court's conclusions of law, "[t]he motion may accompany a motion for a new trial under Rule 59." *Id*.

¶33 In her motion, Mother sought amendment or alteration of the permanency order to include additional findings regarding facts that were allegedly discussed at the permanency hearings. One reason the court gave for its denial of Mother's post-judgment motion is that Mother failed to point the court to the portions of the record demonstrating "which of the proposed facts were actually presented to the Court, whether they were disputed, or merely raised through questions by counsel."[4] Accordingly, the juvenile court found that it lacked "the ability to determine if these facts were raised at trial in such a manner that the Court could find them to be true or not."

¶34 Mother contends that because the juvenile court required her to cite the record in her motion, the juvenile court did not in fact consider any of the information Mother sought to be added to the court's permanency order. Mother argues that the juvenile court's alleged failure to consider her evidence "make[s] the verdict plainly unreasonable and unjust." She claims that "[h]ad the juvenile court reviewed the hearing audio, it would have discovered . . . that the juvenile court, [DCFS], and Mother

---

4. The juvenile court also denied Mother's motion on a second and independent ground, stating that "Mother fails to show that the proposed facts are necessary to a conclusion that Grandmother be appointed as permanent guardian." Because Mother failed to address the second reason for the denial of her post-judgment motion her challenge necessarily fails. *See Hi-Country Estates Homeowners Ass'n v. Jesse Rodney Dansie Living Trust*, 2015 UT App 218, ¶ 5, 359 P.3d 655 ("[A]n appellant must address the basis for the district court's ruling."); *Salt Lake County v. Butler, Crockett & Walsh Dev. Corp.*, 2013 UT App 30, ¶ 28, 297 P.3d 38 ("This court will not reverse a ruling of the trial court that rests on independent alternative grounds where the appellant challenges only one of those grounds.").

would benefit from additional time to gain more information." We are not persuaded.

¶35    To the extent that the proposed findings are supported by evidence in the record, Mother has not demonstrated that the court did not consider this evidence when making its permanency decision. *See In re Estate of Knickerbocker*, 912 P.2d 969, 979 (Utah 1996) (stating that the court "is not required to recite each indicia of reasoning that leads to its conclusions"). As Mother acknowledges, the "juvenile court had the benefit of presiding over the permanency hearing," and it "hear[d] the evidence first-hand." Mother also claims that the facts supporting the amendments and alterations she sought to add to the permanency order were "discussed at length during Grandmother's testimony." Additionally, some of Mother's proposed additions simply note that parts of Grandmother's testimony have not yet been independently verified. The juvenile court was cognizant of this fact, stating that it chose to retain jurisdiction over Children "purposefully so that those unknown issues could be addressed and monitored by the Court to the extent possible." The court's permanency order adequately sets forth the basis for its permanency decision, and the court was not required to give further explanation as to why Grandmother's testimony was credible. *See In re S.T.*, 928 P.2d 393, 398–99 (Utah Ct. App. 1996). We accordingly decline to disturb the juvenile court's ruling on this issue.

CONCLUSION

¶36    The juvenile court correctly denied Mother's post-judgment request for additional findings because the placement provisions of Utah Code section 78A-6-307 do not apply to permanent transfers of custody and guardianship. Moreover, the court's findings of fact were sufficient to support the permanent placement of Children with Grandmother.

Finally, Mother has not shown that the juvenile court erred in denying her request to amend the permanency order entered by the court and for a new trial.

¶37 Affirmed.

_____